UNITED STATES of America,
Plaintiff-Appellee,

v.

William Henry FORREST and Maxine
Forrest, Defendants-Appellants.

No. 78–5759.

United States Court of Appeals,
Fifth Circuit.

June 5, 1980.

Rehearing Denied July 3, 1980.

Robert B. Staats, Panama City, Fla., Henry R. Barksdale, Pensacola, Fla., Wes Pittman, Panama City, Fla., Marc Cooper, Miami, Fla., for defendants-appellants.

Nicholas P. Geeker, U. S. Atty., Pensacola, Fla., Donald S. Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before GODBOLD, HILL and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

William Henry Forrest and his wife Maxine Forrest were convicted by a jury on one count of knowingly buying, receiving and possessing a stolen shipment of eggs in violation of 18 U.S.C. §§ 659 and 2, and on one count of knowingly buying, receiving and possessing a stolen vehicle (containing the eggs) in violation of 18 U.S.C. §§ 659 and 2315. In addition William Henry Forrest was convicted on six counts of knowingly transporting stolen motor vehicles in interstate commerce in violation of 18 U.S.C. § 2312 and on 13 counts of knowingly receiving, concealing and storing stolen motor vehicles, in violation of 18 U.S.C. § 2313.

Maxine Forrest was sentenced to five years' imprisonment on each count, with the sentences to run concurrently. William Henry Forrest also was sentenced to five years' imprisonment on each count. The court collated the 21 counts on which he was convicted into five groups and ordered that the sentences in each group run concurrently with each other but consecutively with the sentences imposed in the other groups, for an effective sentence of 25 years.

This appeal presents four issues: (1) whether there was sufficient evidence to support the conviction of Maxine Forrest, (2) whether the searches and seizures of the vehicles involved violated the Fourth Amendment, (3) whether the prosecutor made impermissible comments about William Henry Forrest's failure to testify and (4) whether the trial court took sufficient steps to safeguard against the effects of an attempt to tamper with the jury. We reverse the convictions of Maxine Forrest. We reject the challenges of William Henry Forrest based on the searches and seizures and the prosecutorial comments. We remand for a limited purpose.

## I. SUFFICIENCY OF THE EVIDENCE

Maxine Forrest was convicted with her husband of knowingly buying, receiving and possessing a tractor-trailer rig and its contents, a load of eggs. Our review of the record convinces us that the government failed to prove the charges beyond a reasonable doubt.

William Henry Forrest was the proprietor of Forrest Mobile Homes, a company that rented out more than 50 mobile homes at a trailer park in Panama City, Florida. Over the years his activities extended to truck-leasing and used-vehicle sales. In 1977, the Federal Bureau of Investigation became suspicious about the ownership of the trucks Mr. Forrest was leasing. An investigation culminated in the arrests of Mr. and Mrs. Forrest and several employees of the truck-leasing operation. The evidence established that William Henry Forrest had been leasing trucks[1] with the knowledge that they were stolen and indeed that he had been involved in the theft of most of them. Mr. Forrest makes no challenge to the sufficiency of the evidence against him.

The Forrests' business operations were conducted from an office next door to the Forrests' home. Mrs. Forrest worked in the mobile home rental office. At trial, she denied any involvement in the truck-leasing operation other than occasional telephone-answering and message-taking. She also had signed, at the direction of her husband, several applications for certificates of title to trucks used in the leasing business. Those trucks were stolen, but there was no evidence showing that she knew of the thefts, and she was not convicted with respect to those trucks.

1. We shall refer to the vehicles and components as "trucks" with the realization that the charges actually involved tractors, trailers, pickup trucks and a stake-body truck.

All the events upon which Mrs. Forrest's conviction is based occurred between Friday, June 16, 1978, and Tuesday, June 20, 1978. On June 16 or June 17, Mr. Forrest arrived home driving a new tractor and a trailer containing 850 cases of eggs. He had stolen the tractor in Raleigh, North Carolina, and the trailer with its load from a truck stop in Atlanta, Georgia. He contacted several Panama City businessmen who agreed to buy some of the eggs, but before he could deliver them he was called away to Denver on other business. He left the task of selling the eggs to an employee, Edwin Ring Hodge.

Just before midnight on Monday, June 19, Mr. Forrest telephoned from Denver. Mrs. Forrest told him that Hodge and other employees were still delivering the eggs. Mr. Forrest told his wife to have Hodge call him as soon as possible. She sent an employee named Don Wayne Barnes to get Hodge, who then telephoned her husband in Denver. There is no evidence that Mrs. Forrest was privy to the conversation between her husband and Hodge. According to Hodge, Mr. Forrest was concerned that the efforts to dispose of a large quantity of eggs significantly below wholesale price in an area as small as Panama City would arouse suspicion. Mr. Forrest told Hodge to abandon the trailer and the remaining eggs at a truck stop in a neighboring county. While carrying out this order, Hodge and Barnes were arrested by FBI agents and local police who had been maintaining a surveillance of the trailer for several hours because of their suspicion that Mr. Forrest had stolen the egg shipment.

Maxine Forrest was convicted of violating 18 U.S.C. §§ 659 and 2315,[2] which provide in pertinent parts:

§ 659 Interstate or foreign shipments by carrier; State prosecutions

Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any . . . motortruck, or other vehicle . . . with intent to convert to his own use any goods or chattels moving as . . . an interstate . . . shipment . . . ; or

Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen . . .

Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both . . .

§ 2315 Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps

Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise . . . which are a part of . . . interstate . . . commerce, knowing the same to have been stolen . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

■ Knowledge that the goods were stolen is an essential element of the offenses. The government bears the burden of proving this element of the crime, as well as all others, beyond a reasonable doubt. *United States v. Barrera*, 547 F.2d 1250 (5th Cir. 1977).

■ In reviewing the sufficiency of evidence in criminal cases, we are to view the evidence and all inferences that reasonably may be drawn from it in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Having viewed the evidence in that light, if we find that a reasonably minded jury must have had a reasonable doubt as to an essential element, we must reverse. *Barrera, supra.*

■ Mrs. Forrest contends that the government did not establish beyond a reasonable doubt that she knew the tractor, trailer and eggs were stolen. The government points to testimony, together with inferences to be drawn therefrom, that it

2. The counts against Maxine Forrest also cite 18 U.S.C. § 2, the general aiding and abetting statute.

claims satisfies that burden of proof. We are referred to Hodge's testimony that Mr. Forrest instructed him to give Mrs. Forrest the proceeds of the egg sales and that he gave her $75 in cash and a check, the amount of which was never stated. There is no evidence that Hodge told Mrs. Forrest that the money was the proceeds of illegal activity, and neither the jury nor this court may infer that knowledge from her acceptance of the money. *United States v. Ramirez*, 441 F.2d 950 (5th Cir. 1971).

 The government contends the jury could have inferred the guilty knowledge from the fact that Mrs. Forrest was married to the kingpin of a large-scale illegal operation[3] and was an agent of his company. That one is married to,[4] associated with,[5] or in the company of[6] a criminal does not support the inference that that person is a criminal or shares the criminal's guilty knowledge.

The government relies heavily on the testimony of Hodge. One statement, highlighted as proof that Mrs. Forrest had knowledge that the truckload of eggs was stolen, was Mr. Forrest's comment that the egg truck was the "easiest one he had ever gotten because the keys were in it." However, on cross-examination Hodge testified that only he and Mr. Forrest were present when this statement was made, and there is no evidence that Mrs. Forrest overheard or had any knowledge of this comment.

The only direct evidence bearing on Mrs. Forrest's knowledge of the reason for the egg sales came from Dennis James Barfield, a Forrest employee. Barfield testified that Mrs. Forrest was told the same thing that the people who bought the eggs were told, i.

e., that the eggs were being sold to offset Mr. Forrest's losses caused by the owner's refusal to pay his freight charges. The government offered no countervailing evidence.

We conclude that the evidence of Mrs. Forrest's guilt of the offenses charged is insufficient to sustain her convictions.

## II. *SEARCHES AND SEIZURES*

Forrest[7] challenges the legality of the searches and seizures of all vehicles identified in the indictment. There were nine separate searches and seizures. All were executed without a search warrant. We assume, without deciding, that Forrest has standing to make a Fourth Amendment challenge.

Forrest mounts a Fourth Amendment attack on five grounds:

1. There was no probable cause to justify the stop, seizure and search of the tractor-trailer containing the egg cargo.

2. If there were probable cause, there were no exigent circumstances sufficient to excuse the requirement that a search warrant be obtained before the FBI and police searched the trailer containing the eggs.

3. The search of the trailer containing the eggs was impermissible under *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

4. Because one of Forrest's employees decided to cooperate with the authorities as a result of the illegal search and seizure of the egg-laden vehicle,

---

3. The evidence shows that William Henry Forrest had stolen vehicles valued at over a quarter of a million dollars.

4. *See United States v. Jones*, 545 F.2d 1112 (8th Cir. 1976); *United States v. DiNovo*, 523 F.2d 197 (7th Cir. 1975); *Arellanes v. United States*, 302 F.2d 603 (9th Cir. 1962). *Cf. United States v. Bullock*, 451 F.2d 884 (5th Cir. 1971) (that defendant was the girlfriend or an intimate friend of one in possession of stolen money orders is insufficient to attribute possession to her).

5. *United States v. Longoria*, 569 F.2d 422 (5th Cir. 1978); *United States v. Martinez*, 486 F.2d 15 (5th Cir. 1973); *Panci v. United States*, 256 F.2d 308 (5th Cir. 1958).

6. *Longoria, supra; United States v. Henderson*, 524 F.2d 489 (5th Cir. 1975).

7. Throughout the remainder of the opinion, "Forrest" shall mean William Henry Forrest unless we indicate otherwise.

all seizures based on information furnished by that employee are "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

5. There was no justification for the warrantless search and seizure of any of the vehicles after the search of the egg-laden trailer.

#### a. *The Facts*

Special Agent Al Beiner of the FBI was the primary officer on this case. He was at the center of most of the activity, dating from his assignment to the Panama City area in late 1977, when he learned of Forrest's reputation for involvement in thefts of vehicles and cargos.

Beiner first noted that Forrest had a trailer with the name Denver-Albuquerque, Commerce City, Colorado, on the panels. He contacted that company, learned it had leased three tractors from Forrest and secured from the company each tractor's model year and the vehicle identification number (VIN) that Forrest claimed had been assigned to it. He then contacted the manufacturer of the tractors and was informed that the VINs he had obtained had been assigned originally to vehicles manufactured in years other than those in which Forrest claimed they had been manufactured. In short, someone had tampered with the VINs. Beiner next communicated with the vehicle identification office in Forrest's county of residence and received information about all tractors and trailers registered by Forrest. Beiner's check with the manufacturer of those vehicles disclosed that their VINs also did not match the correct model years.

Beiner then contacted the Florida Department of Motor Vehicles and determined that Forrest had obtained certificates of title on several of the suspect vehicles by presenting bills of sale from what turned out to be a nonexistent auction company in Alabama.

On June 19, 1978, very shortly after accumulating the foregoing information, Beiner received two additional pieces of intelligence. An agent from the FBI's Baltimore office informed him that a 1978 Fruehauf trailer with Delaware tags, belonging to Peninsular Egg Company, and containing 850 cases of Ann Page eggs, had been stolen in Georgia and was believed to be in the Panama City area. Beiner was given the identification number of the trailer and the serial numbers of the cases of eggs. At about that same time, Beiner was informed by a Panama City produce dealer that a man by the name of "Dennis" was offering to sell approximately 1,000 cases of eggs for one-third to one-half below the prevailing wholesale price. Beiner learned that the telephone number left by "Dennis" was Forrest's business telephone number and that Forrest had an employee by the name of Dennis James Barfield.

Beiner drove out to the Forrest residence late on the afternoon of June 19 and found a trailer with its refrigeration unit operating, parked on a dirt road across the street. The trailer matched the description of the one the Baltimore office had reported stolen. Beiner, assisted by Bay County deputies, placed the trailer under surveillance with the hope that the egg sale to the produce dealer would take place.

Shortly after midnight, the trailer was connected to one of Forrest's tractors and pulled off. Forrest's Lincoln Continental followed as a "countersurveillance car." As the vehicles approached the county line, Beiner and the deputies decided to stop them while they were still within the deputies' jurisdiction.

The tractor was being driven by Barnes. The Continental was being driven by Hodge. Beiner found that the trailer's VIN plate was missing. Its identification number, however, was written on the frame. A registration card, visible from outside the trailer, showed that the owner was the Peninsular Egg Company of Delaware, described the trailer as a 1978 Fruehauf and gave its identification number. All of this information corresponded with that furnished by the Baltimore office in regard to the stolen trailer. Beiner then opened the back of the trailer to see if the egg cargo

was intact. The tractor-trailer was moved immediately to the Federal Building in Panama City. The following morning Beiner examined the egg cases and noted their serial numbers. They were the stolen eggs.

On the morning of June 20, the second half of the first search occurred. The agents secured the vehicle identification number from the frame of the tractor and from the door post. The number confirmed that the tractor was stolen. The government contends the officers did not complete their examination of the vehicle the night before because it was blocking the highway on a dark stretch of road.

Beiner contacted the Bureau's Denver office and asked agents there to request permission from Denver-Albuquerque to check the identification of one of the tractors leased from Forrest. The president of the company gave permission, and the tractor proved to be stolen. It was seized that day, June 20.

Agent Beiner then tracked down seven more trucks or trailers that Forrest had stolen. He learned of the whereabouts of four of them from Hodge, of two others from anonymous telephone callers and of the last one from James William Miller, to whom Forrest had leased it. These seven vehicles were seized after FBI agents inspected their VINs; in four cases, the VINs had been altered and, in three cases, the VIN plates had been removed. During some of these inspections, the agents opened the doors of the vehicles in order to see the VINs.

b. *The Initial Search and Seizure*

The stop, search and seizure of the tractor-trailer with its cargo of eggs began the sequence of seizures, and we examine its validity first.

█ Forrest contends that the officers did not have probable cause to believe a crime had been or was being committed when they stopped the tractor-trailer rig and arrested Barnes and Hodge. We have sketched the information upon which the officers acted. They had ample probable cause to justify their actions.

█ Probable cause exists when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed. *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Savage*, 564 F.2d 728 (5th Cir. 1977); *United States v. Lowery*, 436 F.2d 1171 (5th Cir. 1970), *cert. denied*, 401 U.S. 978, 91 S.Ct. 1208, 28 L.Ed.2d 329 (1971). Probable cause generally involves the factual and practical considerations of everyday life on which reasonable and prudent persons regularly act. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

█ Were the officers authorized to search the trailer after stopping Barnes and Hodge, either as an incident to the arrest or because of exigent circumstances? We conclude that there were exigent circumstances, that no search warrant was necessary and that the search was not proscribed by the decisions in *Sanders, supra,* and *Chadwick, supra.*

The automobile exception to the search warrant requirement needs little articulation. It has been recognized for over half a century, since the early days of the expanded use of the horseless carriage.

[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant . . .

*Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

Forrest argues that the recent decisions in *Sanders* and *Chadwick* proscribe the warrantless search of the trailer. In those

cases, warrantless searches of automobiles disclosed a footlocker in *Chadwick* and a suitcase in *Sanders*. The Supreme Court held that the warrantless searches of the footlocker and suitcase violated the Fourth Amendment. Forrest contends that the trailer loaded with eggs is, for Fourth Amendment purposes, indistinguishable from the footlocker and the suitcase. We cannot agree with his analogy. A trailer is not an enlarged footlocker. It is an essential part of a mobile rig.

In *Chadwick* and *Sanders*, the Supreme Court listed the reasons for the automobile exception: (1) the inherent mobility of automobiles often makes the obtaining of a warrant impractical, and (2) one's expectation of privacy in an automobile is lower than it is with respect to differently situated property. The court concluded that because seized luggage is not as mobile as seized automobiles and because people have a significant expectation of privacy in their baggage, the underlying reasons for the automobile exception do not justify its application to luggage.

The trailer in the instant case is entirely different from the footlocker and the luggage. The reasons for the automobile exception apply to the trailer. For the large trailer, no less than for an automobile, "[a]bsolutely secure storage facilities may not be available, . . . and the size and inherent mobility of a vehicle makes it susceptible to theft or intrusion by vandals." *Chadwick*, 433 U.S. at 13, n.7, 97 S.Ct. at 2484–85 n.7, 53 L.Ed.2d at 550 n.7. Additionally, the expectation of privacy in a trailer is no greater than that in an automobile.

Having found both probable cause and exigent circumstances existed at the time of the stop, we hold that the search of the egg trailer at the scene—the opening of the doors and looking inside—was permissible. The continuation of the search the next morning, when the egg cases' serial numbers were examined, was also permissible.

*See Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The mere passage of time between the seizure and the search does not change this exception to the warrant requirement. As we noted in *United States v. Mitchell*, 538 F.2d 1230, 1232 (5th Cir. 1976) (en banc):

> Appellant's first contention, that by the time of the search the truck had been immobilized, exigence had passed, and a warrant could have been obtained at leisure, is foreclosed by *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Both of these authorities recognize that exigence is to be determined as of the time of seizure of an automobile, not as of the time of its search; the fact that in these cases sufficient time to obtain a warrant had passed between each seizure and the corresponding search did not invalidate either.

The foregoing disposes of the first four elements of Forrest's Fourth Amendment challenge. There was probable cause for the initial stop and arrest and exigent circumstances justified the search of the tractor-trailer. That search was not proscribed by *Sanders* and *Chadwick*. Therefore, the searches and seizures that resulted from Hodge's cooperation with the FBI are not "fruit of the poisonous tree." That leaves only Forrest's final attack, *i. e.*, that all searches and seizures after the first one should have been made pursuant to search warrants. All of those seizures followed inspections for identification numbers.

#### c. *Vehicle Identification Checks*

■ We repeatedly have held that the examination of a vehicle for the purpose of inspecting the VIN plates or identification-number inscriptions is not a search for purposes of the Fourth Amendment.[8]

**8.** *United States v. Duckett*, 583 F.2d 1309 (5th Cir. 1978); *United States v. Sheriff*, 546 F.2d 604 (5th Cir. 1977); *United States v. Williams*, 434 F.2d 681 (5th Cir. 1970); *United States v. Polk*, 433 F.2d 644 (5th Cir. 1970); *United States v. Johnson*, 413 F.2d 1396 (5th Cir.

An inspection by police officers is not a search merely because the police must open the door of the vehicle in order to examine the VIN plate. *Williams, supra; Polk, supra.* In *Duckett* and *Johnson,* we found such inspections were justified because the officers had legitimate reasons to suspect criminal activity was afoot. In the instant case the agents had more than sufficient legitimate reasons to suspect criminal mischief. They were justified in making their inspections. Upon doing so, in some instances, they found numbers which proved to be those of stolen vehicles. In other instances they found the VIN plates had been removed. Removal of these plates in most states, including Florida, is prohibited.[9]

Once these inspections were made, the agents had probable cause to seize the vehicles. The VINs on the vehicle seized in Denver on June 20 and on four of the vehicles seized thereafter matched the phony VINs that Forrest had given to Denver-Albuquerque or to the county vehicle-identification office. Once the agents saw those VINs, they had probable cause to believe the vehicles had been stolen. The agents' inspections of the three other vehicles revealed that the VIN plates had been removed. When the agents saw that the plates were missing, they had, if not probable cause to believe the vehicles were stolen, at least probable cause to believe there had been a violation of Florida law. Once the agents had probable cause to believe these crimes had been committed, seizure of the vehicles without a warrant was permissible.

## III. PROSECUTORIAL COMMENT

Forrest contends that the prosecutor violated his Fifth Amendment rights by impermissibly commenting on his failure to testify. We find no merit in this contention.

During the closing argument, the prosecutor attacked the contention put forward by the defense that Forrest had been in Denver on Saturday, June 17, the day on which many of the egg sales were arranged. While reviewing for the jury the testimony of a Panama City restaurateur who testified for the government, the prosecutor said:

How about Joe Dasinger, a friend of the Forrests? He said, "I got a call from William Forrest sitting right there and he said, 'Hey, I've got some eggs I want to sell.'"

Now, that was the crux of his testimony. Forrest is saying he doesn't know anything about any eggs through Maxine. She's you know, testified, "We don't know anything about these eggs and Bill is out there in Denver," and all of that. Joe Dasinger says, "Saturday Bill Forrest called me on the phone, said, "I've got some eggs for sale, do you want any.'"

Forrest argues that the reference to his wife's testimony improperly drew the jury's attention to his decision to exercise his Fifth Amendment right to refrain from testifying.

Both direct[10] and indirect[11] comments on a defendant's decision not to testify violate his Fifth Amendment right against compulsory self-incrimination. In reviewing a prosecutorial comment that allegedly infringes this right, a court must "look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury." *Samuels v. United States,* 398 F.2d 964, 967 (5th Cir. 1968), *cert. denied* 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). Thus, statements that might appear

---

1969); *Weaver v. United States,* 374 F.2d 878 (5th Cir. 1967).

9. Fla.Stat.Ann. § 320.33 (West) makes it "unlawful for any person to knowingly . . . have in his possession any motor vehicle from which the manufacturer's serial number or any other distinguishing number or identification mark has been removed . . . for the purpose of concealment or misrepresenting the

identity of the said motor vehicle." *See State v. Cohn,* 284 So.2d 426 (Fla.Dist.Ct.App.1973).

10. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

11. *Carlin v. United States,* 351 F.2d 618 (5th Cir. 1965).

improper when considered in a vacuum may be found permissible when examined in context. *United States v. Driscoll*, 454 F.2d 792 (5th Cir. 1972); *United States v. White*, 444 F.2d 1274 (5th Cir. 1971); *Samuels, supra*. In *Samuels*, we approved a closing argument in which the prosecutor had said that the defendant, who had not testified, "does not want to talk about the facts." We concluded that, in making the statement, the prosecutor merely was pointing out that he had dealt at trial only with the facts at issue in the case, while the defense had presented "supposition, innuendo and insinuation." The reference to "defendant" was, in effect, a reference to defense counsel.

■■■ The case at bar is very similar. The reference to Maxine Forrest's testimony was nothing more than the prosecutor's description of the alibi upon which Forrest was relying and that the prosecutor was attacking. We conclude that the above-quoted statement was not motivated by the prosecutor's "manifest intention" to comment on Forrest's failure to testify and that it did not have a negative "natural and necessary impact upon the jury."

## IV. JURY TAMPERING

The final issue raised by Forrest is most serious and has occasioned a painstaking review. Did he receive a trial by a fair and impartial jury?

The Forrests' trial began in Panama City on Monday, October 23, 1978. On Friday, October 27, after all evidence had been adduced but prior to final arguments and charge to the jury, agent Beiner informed the trial judge of an attempt at jury tampering. Present in chambers when this information was conveyed were the district judge, the prosecuting attorneys, defense counsel, two United States deputy marshals and agent Beiner. The members of the jury were in the jury room. Beiner told the judge that he had received an anonymous phone call on Wednesday evening during which the caller told him that William Henry Forrest had arranged to have Eloise Surratt, an acquaintance of Maxine Forrest, contact a member of the jury to persuade the juror to vote for acquittal. The caller did not know which juror was involved but had heard it was Surratt's aunt.

After discussing the problem with counsel, the judge instructed one or both of the marshals to enter the jury room and ask whether any juror had a relative named Eloise Surratt. The court's instructions were as follows:

Here's what I want to know. Tell them I want to find out if any one of them has a relative or knows a person by the name, that goes by the name of Eloise Surratt or Sarrett and that according to my understanding, at least, once lived here, may now live in Louisiana, but mainly the name is Eloise Surratt or Sarrett, wants to know if any one of them in there knows a person by such a name or is related to a person by such a name. That's about it, isn't it?

\* \* \* \* \* \*

If anyone says yes, you get the name of the juror, whoever it is, come back in. If it's more than one juror, come back in with those names.

The marshal went into the jury room and returned very quickly to report the name of juror Lillie Bell Watson. No record was made of the marshal's comments to the jurors or of any response any juror might have made.

Watson was then brought into chambers and questioned by the court. She confirmed that she had been contacted during the trial by her niece, Eloise Surratt, whom she knew to be a friend of the Forrests. Watson's description of her meeting with Surratt made it clear that her niece had sought to make her favorably disposed toward Maxine Forrest. Watson told the court that none of the other jurors was aware of the tampering attempt.

The prosecutor had no question as to the impropriety of the contact:

Judge, I'm going to have to request she be excused. I think it's obvious her information was correct, that her niece flew all the way out here and she's a friend of

the defendants and she was putting in a good word for good old Maxine and I don't see how she could possibly sit under these circumstances.

The court was also impressed with its adverse effects:

> She says it won't affect her but it might affect her one way or the other. It might persuade her toward guilt or persuade her toward innocence. That's the problem with it.

The trial court excused Watson, replaced her with an alternate and told the remaining jurors:

> Because of some matters we felt it desirable that Mrs. Watson be excused from further participating in the jury through no fault of hers, I want you to know that

. . .

Both Forrests were indicted for jury tampering as a result of the Surratt incident. William Henry Forrest was convicted. The government dismissed the indictment against Maxine Forrest.

There are three ways in which the jury might have been tainted:

(1) After she was contacted by Surratt but before she was excused, Watson may have discussed the merits of the case with the other jurors.

(2) Watson may have told the other jurors about the tampering attempt.

(3) The marshals may have indicated to the other jurors that there had been a tampering attempt.

 Any off-the-record contact with a jury is presumptively prejudicial, and the government bears a heavy burden of proving that such a contact did not affect the jury. *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *United States v. Chiantese*, 582 F.2d 974 (5th Cir. 1978); *United States v. Betner*, 489 F.2d 116 (5th Cir. 1974). If the government cannot meet that burden, a new trial must be ordered. *Remmer v. United States*, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956). When there has been an attempt at jury tampering, the court must guard against the possibility that the jury will assume one of the parties was responsible for the attempt and, based on that assumption, decide the merits of the case unfavorably to that party. *Stimack v. Texas*, 548 F.2d 588 (5th Cir. 1977). *Cf. United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978) (conviction reversed because jury had been exposed to newspaper report that life of government witness had been threatened). The court also must guard against the possibility that the tampered-with juror will comment on the merits of the case in the presence of other jurors. *United States v. Ferguson*, 486 F.2d 968 (6th Cir. 1973). Whether the comments are favorable or unfavorable to the defendant is immaterial.

The applicable legal standards are clear, but the facts to which they must be applied are not in the record. We have noted above three ways in which prejudicial contact might have occurred, but we cannot be certain whether any did. We cannot determine what Watson may have said in the presence of any other juror after being contacted by Surratt. Even a passing reference to the merits of the case or to the contact would have carried the potential for prejudice. We do not know what the marshals said in the jury room and what responses their inquiries may have caused. Other than Mrs. Watson's statement that the others knew nothing about the contact, the record is silent as to the knowledge the other jurors might have had. Watson's testimony on this point is insufficient. We must be mindful of the fact that at the outset of the trial the judge told the jurors to avoid contacts with anyone involved with the case and not to discuss the case among themselves until they retired. Watson's natural disposition would be to claim she had complied with those instructions. Only the other jurors can enlighten us properly on this subject.

 A party claiming that an improperly influenced jury returned a verdict against him must be given an opportunity to prove that claim. *Remmer, supra; Herring, supra; Richardson v. United States*, 360 F.2d 366 (5th Cir. 1966).

Our decision in *Herring* provides the most guidance in our tailoring of the limited remand we now make. *Herring* involved a conviction by a jury that allegedly had been exposed to a prejudicial newspaper article. We remanded the case and directed the trial judge to determine, by using a two-step test recommended by the American Bar Association, whether questioning of the jurors was warranted. The judge was to inquire, first, whether the article went "beyond the record . . . and raise[d] serious questions of possible prejudice" and, second, whether it was likely that the damaging material had in fact reached the jury. We concluded that, if this threshold inquiry showed that extraneous prejudicial material had likely reached the jury, "The district court . . . should . . . [examine] each juror separately, in the presence of counsel, to determine (1) how much contact the jury members had had with the damaging publicity and (2) how much prejudice to the defendant had resulted from that contact, assuming that any had occurred," *Herring*, 568 F.2d at 1106.

Our very recent opinion in *United States v. Johns*, 615 F.2d 672 (1980), provides some guidance as to the appropriate manner of handling an indication that a jury's deliberations might have been adversely affected. When informed that an alternate juror had received information that a witness had been killed, the court had a full hearing to determine the facts, including the extent to which other members of the jury had shared the information. The court made specific findings of the absence of prejudice.

█ In the present case, the district court need not make the threshold inquiry adopted in *Herring*. Contacts such as those that may have occurred in this case raise serious questions of prejudice. Furthermore, even given the limited record presented on appeal, we can conclude that it was sufficiently likely that prejudicial ma-

terial reached the jury. On remand, the district court should question the persons involved in the manner ordered in *Herring*. The jurors should be questioned. The marshals should be questioned. If it appears that the jury was contacted impermissibly, and if the government fails to satisfy its burden of proving the contact was not prejudicial, a new trial must be ordered. We cannot conclude now, as counsel for Forrest urges, that a new trial is warranted. *United States v. Allison*, 481 F.2d 468 (5th Cir. 1973). Nor can we categorically dismiss this assignment of error, as the government requests.

█ It makes no difference in this case that it was Forrest himself who initiated the contact that may have poisoned the jury. We reject the suggestion that Forrest may not be heard here to complain of the results of his own misconduct. He has been convicted of jury tampering and for that misconduct is subject to punishment. That is an entirely discrete matter. At issue in his trial in this case was whether Forrest had dealt in stolen goods, not whether he had tried to corrupt the judicial system. A fair and impartial jury cannot be permitted to draw the conclusion that, because a defendant attempted to fix his trial, he is guilty of the offense for which he is being tried. It is conceivable that a defendant, innocent of the charge being tried, might attempt to tamper with a jury to assure a favorable verdict.

Some may suggest that our holding today will encourage defendants to tamper with juries, furnishing defendants with a "heads-I-win, tails-you-lose" proposition: a successful effort secures an acquittal, an unsuccessful effort secures reversal on appeal. We reject that suggestion. The possibility of attempts at jury tampering are ever present. The penalties for that misconduct are serious and can markedly compound a defendant's punishment.[12] We do not think

---

12. *See* 18 U.S.C. § 201 (bribery of, *inter alia*, a juror, subject to a penalty of 15 years' imprisonment, a $20,000 fine or both), 18 U.S.C. § 245 (intimidation of a juror by force or threat, subject to a penalty of one year-to-life imprison-

ment and fines ranging from $1,000 to $10,000), 18 U.S.C. § 1503 (corrupt influence or impeding of a juror, subject to a penalty of five years' imprisonment, a $5,000 fine or both), 18 U.S.C. § 1504 (attempt to influence a juror by written

our ruling today will encourage defendants to embrace the risk of exposure to that punishment in exchange for a chance of reversal on appeal with remand for re-trial.

## REMAND

 We remand for a qualified *Herring* -type hearing. As many of the jurors as the district court deems appropriate, the marshals and any others the court wishes to hear shall be examined on the record, under oath. If the district court concludes that there was prejudicial contact a new trial shall be ordered. If the district court concludes that no prejudicial contact occurred then the convictions of William Henry Forrest shall stand affirmed. Any appeal which might be taken to the decision of the district court on this remand shall be redocketed in this proceeding, before this panel, on an expedited briefing schedule to be set by the clerk of this court.

## CONCLUSION

The convictions of Maxine Forrest are REVERSED.

The contentions of William Henry Forrest that his convictions are invalid because of impermissible searches and seizures and improper prosecutorial comment are rejected.

The case is REMANDED for the hearing on the issue of improper jury contact, as discussed herein.

communication, subject to a penalty of six months' imprisonment, a $1,000 fine or both) and 18 U.S.C. § 401 (contempt of court, subject to a penalty of imprisonment within the discretion of the court, with no fixed maximum period).