**David Earl MILLER, Petitioner-Appellee,**

v.

**W. J. ESTELLE, Jr., Director, Texas
Department of Corrections,
Respondent-Appellant.**

**No. 81–1285.**

United States Court of Appeals,
Fifth Circuit.

June 10, 1982.

As Modified on Denial of Rehearing and
Rehearing En Banc Aug. 18, 1982.

Mark White, Atty. Gen., Gilbert J. Pena, Brenda K. Smith, Asst. Attys. Gen., Austin, Tex., for respondent-appellant.

Ernest E. Figari, Jr., (Ct.-Apptd.), Tom Graves, Dallas, Tex., for petitioner-appellee.

Before CLARK, Chief Judge, THORN-BERRY and GARZA, Circuit Judges.

GARZA, Circuit Judge:

The sole issue raised on this appeal is whether or not appellant, David Earl Miller, was denied his right to a fair trial by virtue of third party contacts with several members of his jury. We find he was not, and reverse the district court's grant of the Great Writ.

The crime involved was aggravated rape.[1] On March 21, 1975, at approximately 7:30 p. m., the victim, a 25 year-old DMT transcriber for the Environmental Protection Agency, was awaiting a bus to take her home after visiting a beauty salon. While she was waiting, appellant, a young black male, twice cruised by in his car and asked if she was going home and if he could offer her a ride. When these attempts to get her to accompany him failed, appellant parked his car and approached her on foot. He roughly caught her by the arm and said, "You're going with me, all I want to do is give you a ride." At this point the woman heard what

she believed to be the clicking sound of a gun and was forced into appellant's car. Once in, she was told, "You'd better not try to get away," and they proceeded to drive off.

Fifteen minutes later appellant turned onto a deserted dirt road leading up to a factory. Convinced now of the fate she was about to suffer, the woman tried to jump out of the car, but caught her hand in the car door handle. When it was freed, she fell out of the car and onto the dirt road where her arm, leg and torso were immediately run over by appellant's right rear wheel.

The woman tried to get up to escape but only managed to get about ten feet away before appellant caught up with her. He grabbed her by the neck and told her that if she did not stop her hysterical screaming he was going to hurt her. He then backed up his car and threw her in the back seat scraped, bleeding and injured where he proceeded to rape her. Afterwards, he drove away, leaving his victim semi-nude in the deserted field.

The woman managed to walk back up to the highway, and then to a service station where she had the attendant call the police. Although she was hospitalized that night, no broken bones were discovered. The very next evening the police showed her a group of photographs among which was one of appellant; Miller was positively identified.

On April 25, 1975, Miller was indicted on the charge of aggravated rape. Texas procedural rules require an accused to elect before trial whether he wishes the judge or the jury to assess punishment;[2] Miller chose to go with the jury. On July 17, 1975, evidence concerning the guilt or innocence of Miller was presented, and later that afternoon the case was submitted to the jury. The jury returned a verdict of guilty later that evening, but because of the lateness of the hour, the court decided to delay until the next day the punishment phase of the trial. Accordingly, members of the jury were allowed to leave the courthouse and

---

1. At the time Miller was indicted, aggravated rape was a first degree felony with a punishment range of five years to life.

2. Tex.Code Crim.Pro. art. 37.07, § 2(b).

return to their homes for the night. It was during this interval that several members of the jury were involved in a number of incidents with certain black persons whom they believed were aligned with Miller.

Immediately after the verdict of guilty was announced and the trial adjourned for the day, several members of the jury proceeded to the elevator located outside the courtroom on the sixth floor of the Dallas County Courthouse. As they approached the elevator, four or five members of the jury were accosted by one or more black persons whom the jurors believed to be members of Miller's family. The black persons, upset and angry about the verdict, physically approached within two to six feet of the jurors and, in a very loud and profane manner, yelled at the jurors for deciding the way they did.

At or about the time of the sixth floor incident, three or four other members of the jury, including Scharlene Lewis, were exiting from an elevator on the ground level of the courthouse. As they moved out of the elevator, a group of blacks approached them with their arms raised and outstretched towards the jurors. According to Lewis, the black persons approached in an aggressive fashion, and it appeared to her that they were going to physically attack the members of the jury. Fortunately, however, a security guard intervened, restored peace, and escorted the jurors out of the courthouse to safety.

Also on the ground level of the courthouse, two women jurors, Esther Verhoeven and Elimita McMorris (the only black on the jury), were encircled by a group of five or six blacks as they were leaving the elevator. This group of black persons had their arms raised as if they were going to strike the two women. Verhoeven crawled between two of them and quickly went downstairs in order to get help from the sheriff's office. After finding the office empty, she returned to the scene of the incident, but by that time the group had dispersed and only McMorris remained. In order to protect McMorris from a possible reoccurrence of the confrontation, Verhoeven and her husband escorted her from the courthouse to her bus stop.

The next day, Verhoeven informed the trial court of the incident in which she was involved, and requested some sort of security for jurors who stayed late; the court reportedly agreed to take care of the matter. Burnett Wilson, Miller's court appointed counsel, stated for the record outside the presence of the jury his awareness of the sixth floor incident[3] and his belief that the jury might have been adversely influenced by it. When the jury returned, they had sentenced Miller to 60 years. Although several of the jurors testified at the evidentiary hearing below that they were aware of the confrontations, they also admitted that there was no discussion of them during their deliberations.[4]

Four motions for new trial were filed, one by Miller's attorney and three *pro se*, none of which complained of an excessive sentence or improper contact with the jury; all were denied. On appeal, the Texas Court of Criminal Appeals affirmed the conviction in an unpublished per curiam opinion.[5] Thereafter, Miller filed an application in state court for writ of habeas corpus, but the application was denied.

Having been unsuccessful in his efforts to obtain any type of relief in the state court

---

**3.** After hearing a commotion outside the courtroom, Wilson went out into the hall where he witnessed the conclusion of the sixth floor incident. At the time of the trial, Miller and his attorney were only aware of this single confrontation. Although the state trial judge was informed about the other incidents by the jurors involved, he conducted no inquiry into the matter and did not disclose such developments to the parties. Miller and his attorney finally learned of the other two confrontations five years later at the evidentiary hearing conduct-

ed by the district court to determine whether appellant was denied a fair and impartial jury.

**4.** It should be noted that prior to the evidentiary hearing appellant moved to foreclose inquiry into and exclude evidence of the mental processes of the jurors pursuant to Fed.R.Evid. 606(b). Although the magistrate agreed to take objections on a case by case basis, no such evidence was admitted.

**5.** *Miller v. State*, Tex.Cr.App., 566 S.W.2d 646 (1978).

system, Miller filed the current petition for writ of habeas corpus in federal district court. After whittling down Miller's alternative theories for relief, the district court ordered an evidentiary hearing to help determine whether appellant was in fact denied a fair and impartial jury during the sentencing phase of his trial. In the end, the lower court granted Miller's petition on the basis of the improper jury contact claim. It is that grant that this court now reverses. Before reaching the merits, however, two preliminary matters must first be addressed.

### Exhaustion of State Remedies

As earlier noted,[6] Miller was conscious only of the sixth floor incident at the time he petitioned for state writ of habeas corpus. The others he learned about for the first time at the evidentiary hearing ordered by the federal district court. It is the government's position that because every factual allegation in support of his claim was not raised, appellant failed to afford the State a fair opportunity to rule upon his claim of improper jury contacts. The district court disagreed, and we affirm that portion of its opinion.

In *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), the Supreme Court had this to say of the exhaustion requirement:

> It has been settled since *Ex parte Royall*, 117 U.S. 241, 29 L.Ed. 868, 6 S.Ct. 734 (1886), that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus. The exhaustion-of-state remedies doctrine, now codified in the federal habeas statute, 28 U.S.C. §§ 2254(b) and (c), reflects a policy of federal-state comity, "an accommodation of our federal system designed to give the State the initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." We have consistently adhered to this federal policy, for "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." *It follows, of course, that once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied.*
>
> We emphasize that the federal claim must be fairly presented to the state courts. If the exhaustion doctrine is to prevent "unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution," it is not sufficient merely that the federal habeas applicant has been through the state courts. *The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.* (emphasis added; citations omitted).

404 U.S. at 275–76, 92 S.Ct. at 512. *See also Escobedo v. Estelle*, 650 F.2d 70, 72 (5th Cir. 1981); *Bufalino v. Reno*, 613 F.2d 568, 570 (5th Cir. 1980); *Ogle v. Estelle*, 592 F.2d 1264, 1267 (5th Cir. 1979); and *Galtieri v. Wainwright*, 582 F.2d 348, 353–54 (5th Cir. 1978) (en banc).

Under the facts of this case it cannot be said that the state was not "fairly presented" with an opportunity to hear Miller's claim. Without question the issue of improper jury contacts was squarely raised;[7]

---

**6.** *See* note 3 *supra.*

**7.** In pertinent part, appellant's state-court habeas petition stated the following:

> Petitioner alleges that he was denied his right to a fair and impartial Jury guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution. Petitioner further contends that without his consent, jury had been permitted to separate for dinner and lunch. It is Petitioner's contention that some unknown third [party] initiated a dispute with members of the Jury. Consequently, it is alleged that the nature of the dispute resulted in derogatory [remarks] and profanity among members of the Jury, and the third party. This course of conduct on the part of an unknown party and members of the jury prejudiced the petitioner. As a result petitioner received punishment at sixty

the incidents left out differed only in number, not in kind, from the one which formed the basis for Miller's federal claim.[8] This surplusage was simply not crucial to the claim which was already before the state court.[9] Given this set of circumstances, Miller was entitled to a federal court determination of the merits of his claim.[10]

## Waiver

■ The government next argues that consideration of the merits of Miller's federal claim is barred under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), for failure to contemporaneously object and seek relief from the conduct of which he complains.[11] We note, however, that the denial of habeas corpus relief at the state level was not based upon appellant's failure to timely object, but, rather, was a decision on the merits. It is well settled that a federal court is not barred from considering the merits of a ground for relief by reason of the fact that petitioner failed to make a contemporaneous objec-

tion, where the state courts did not rely upon the contemporaneous objection rule in denying relief. *County Court of Ulster County v. Allen*, 442 U.S. 140, 146–55, 99 S.Ct. 2213, 2219–23, 60 L.Ed.2d 777, 785–91 (1979); *Braxton v. Estelle*, 641 F.2d 392, 394 (5th Cir. 1981); *Thomas v. Blackburn*, 623 F.2d 383, 386 (5th Cir. 1980); *Moran v. Estelle*, 607 F.2d 1140, 1141–42 (5th Cir. 1979); *Madeley v. Estelle*, 606 F.2d 560, 561 n.1 (5th Cir. 1979); *Cannon v. Alabama*, 558 F.2d 1211, 1216 n.12 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1281, 56 L.Ed.2d 792 (1978). This principle applies irrespective of how briefly or summarily the state court treats the merits of a petitioner's claim. *See, e.g., Thomas v. Blackburn*, 623 F.2d at 386 n.1.

## The Merits

■ Proceeding to the merits, we initially note that this is a case of first impression. The sole substantive issue presented on appeal is whether the heavy burden placed upon the government by *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), and its progeny [12] to dem-

(60) years confinement in the Texas Department of Corrections [sic].

8. "The question on remand is whether any of petitioner's claims is so clearly distinct from the claims he has already presented to the state courts that it may fairly be said that the state courts have had no opportunity to pass on the claim ..." *Humphrey v. Cady*, 405 U.S. 504, 516 n.18, 92 S.Ct. 1048, 1056, 31 L.Ed.2d 394, 407 n.18 (1972).

9. In addition, the state court denied Miller's claim without a hearing, appointment of counsel, or an opportunity for members of the jury to be called or examined. If the court had granted appellant's request for a hearing and given him the assistance of appointed counsel, it is possible that all of the facts before this Court would have been developed at the state level.

10. As the district court recognized, all of the cases cited by the State are distinguishable from the present one. In *Knoxson v. Estelle*, 574 F.2d 1339 (5th Cir. 1978), petitioner raised new factual "allegations" on appeal that were not made in the state court. The same is true for *Schiers v. California*, 333 F.2d 173 (9th Cir. 1964), where petitioner made new factual "assertions" in federal court. Finally, in *United States v. Herold*, 349 F.2d 372 (2nd Cir. 1965), the petitioner made "no effort ... to bring certain facts to the attention of the state court." *Id.* at 373 n.1.

11. In support of its claim of waiver, the government observes that although appellant's trial counsel was aware of at least the sixth floor incident, he did not request the trial court to inquire further into the incident, nor did he ask that the court instruct the jury accordingly. No motion for mistrial was made, and the incident was not urged as a basis for any of Miller's motions for new trial. In fact, all that was said of the matter by defense counsel was the following:

MR. WILSON: I would like to give a Bill of Exceptions here.

Based upon a confrontation last night between a member of David Miller's family and the jury, which occurred last night about 5:30, and, from what I understand, there were some obscene gestures and some profanity directed at the jurors after they reached a verdict, after they were discharged for the night, to come back in the morning, before they came back for the punishment phase.

I just want this in the record in case the verdict does come back excessive, that maybe this influenced some of the jurors in their decision.

12. *See, e.g., United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980); *United States v. Jones*, 597 F.2d 485 (5th Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 728 (1980); *Stimack v. Texas*, 548 F.2d 588 (5th Cir. 1977);

onstrate the harmlessness of third party contacts with the jury before the verdict should also be extended to the sentencing phase of the trial. Under the facts of this case, we hold that it should not.

In *Remmer*, a juror in a federal criminal trial was approached by someone offering money in exchange for a favorable verdict. An FBI agent was assigned to investigate the attempted bribe, and the agent's report was reviewed by the trial judge and the prosecutor without disclosure to defense counsel. When they learned of the incident after trial, the defense attorneys moved that the verdict be vacated, alleging that they would have moved for a mistrial and requested that the juror in question be replaced by an alternate juror had the incident been disclosed to them during trial. In vacating the verdict, the Supreme Court espoused the following rule:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox v. United States*, 146 U.S. 140, 148–150, 36 L.Ed. 917, 920, 921, 13 S.Ct.

50; *Wheaton v. United States* (CA8th SD) 133 F.2d 522, 527.

347 U.S. at 229, 74 S.Ct. at 451.

Although not enunciated in *Remmer*, the "obvious reason" underlying the presumption of prejudice is the defendant's right to have the jury pass upon his guilt or innocence "free from the external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917, 921 (1892).[13] Prior to conviction, the burden rightfully rests upon the government in light of the fact that it is the government that must prove its case and overcome defendant's presumption of innocence.

Miller's trial, however, was bifurcated; because of Texas procedure, it was broken down into a guilt phase and a punishment phase, each to be determined by the jury.[14] Appellant admits that the guilt phase in his trial was unblemished; however, because the jury also determined his sentence, he argues that the heavy burden placed on the government by *Remmer* should also carry over to this later proceeding. We disagree.

The policy considerations underlying the burden placed on the government with respect to jury tampering prior to conviction are not present at the post-verdict stage. Once found guilty by an untarnished jury, a defendant's presumption of innocence obviously vanishes. The government has nothing more to prove. Instead, it is the defendant who now has every incentive to tamper with the jury, especially when the punishment may be stiff.[15] Placing the burden of overcoming the presumption of prejudice on the government at this stage would only encourage jury tampering.[16] To

and *Richardson v. United States*, 360 F.2d 366 (5th Cir. 1966).

13. In *Mattox*, primarily relied upon by *Remmer*, the Supreme Court emphasized that private communications between jurors and third parties would *invalidate the verdict* unless harmlessness was shown. 146 U.S. at 150, 13 S.Ct. at 53.

14. As noted earlier, under Texas criminal procedure a defendant may elect to have the jury not only determine his guilt or innocence, but also his sentence. Tex.Code Crim.Pro. art. 37.-07, § 2(b).

15. This is particularly true in the instant case. Texas procedure requires that after the defendant elects, as here, to have the jury pass on punishment the jury that convicts is also the one that passes sentence. Miller could not simply be resentenced but, first, would have to be retried.

16. *Compare United States v. Forrest*, 620 F.2d 446, 458 (5th Cir. 1980) (dicta) (jury tampering unlikely) *with United States v. Jones*, 597 F.2d 485, 489 (5th Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 728 (1980) (dicta) (jury tampering probable).

prevent such sandbagging, it is appropriate that the burden of showing prejudice in this later phase should be placed upon the defendant, at least in situations in which the state is not responsible for the contact. The burden, however, should not be reinforced by a deemed presumption. The defendant may carry this burden by showing that reasonable jurors would have been affected to his prejudice.

██ Applying this standard to the instant case, we find that the burden was not met. The transcript for the evidentiary hearing ordered below reveals that although some mention of one or more of the three incidents was made in the presence of other jurors prior to the commencement of the punishment phase, there was no discussion of them during jury deliberations.[17] It is entirely unpredictable whether the contacts moved the jurors involved to be more harsh or more lenient. All we know is that Miller by no means received the maximum sentence available,[18] and in light of the facts of this case it cannot be said that 60 years was excessive.

AFFIRMED IN PART, REVERSED IN PART.

---

**17.** Record, vol. 2, at 24, 46, 75–76 and 82–84.   **18.** *See* note 1 *supra.*