799 F.2d 665
 21 Fed. R. Evid. Serv. 1033
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jimmie Richard ADAMS, William Francis Elliott, James Henry
Morrell, Jr., Elba Pintado-Otero, Luciano Morra, William
Hinton Hockaday, Larry Henton Hockaday, James W. McMullen,
Jerry Gray Hockaday, Defendants-Appellants.
 No. 85-3315.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 15, 1986.
 
 H.B. Edwards, III, Valdosta, Ga., for Adams.
 John F. O'Donnell, Ft. Lauderdale, Fla., for Elliott.
 Paul D. Lazarus, Ft. Lauderdale, Fla., for Morrell.
 John Lipinski, Miami, Fla., for Otero.
 Armando Garcia, Tallahassee, Fla., for Morra.
 Clyde M. Taylor, Tallahassee, Fla., for W.H. Hockaday.
 L. Sanford Selvey, II, Tallahassee, Fla., for L.H. Hockaday.
 Clifford L. Davis, Tallahassee, Fla., for McMullen.
 Judith Dougherty, Tallahassee, Fla., for J.G. Hockaday.
 Barbara Schwartz, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Florida.
 Before RONEY, Chief Judge, CLARK, Circuit Judge, and GIBSON*, Senior Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge:
 
 
 1
 The appellants challenge their narcotic related convictions on several grounds, including improper jury contact, prosecutorial misconduct, and sufficiency of the evidence. For the reasons discussed below, we affirm their convictions.
 
 
 2
 The government secured an eight count indictment charging nineteen individuals with various narcotics crimes as a result of their participation in a marijuana smuggling operation. The case involves two separate importations of marijuana. The first occurred in September 1979 and involved the vessel "Christine." The Christine sailed to the Caribbean where it met a large ship that was carrying several thousand pounds of marijuana. The Christine took on 6,000 pounds of marijuana and sailed for Florida. The vessel anchored about twelve miles off the shore of Steinhatchee, Florida. A helicopter off-loaded the marijuana and transported it to a "stash site" near Greenville, Florida. The second importation occurred in October 1979 and involved a freighter that was anchored off the coast of northern Florida. The freighter had on board several thousand pounds of marijuana. The marijuana was off-loaded by helicopter and by small boats, and taken to the stash site. Twelve of the nineteen individuals named in the indictment were tried and convicted by a jury for their participation in these importations. Nine of those twelve defendants now appeal.[1]
 
 I. IMPROPER JURY CONTACT
 
 3
 All nine appellants take issue with the district court's[2] ruling on the "improper jury contact" issue. Before proceedings resumed in the morning of the day on which closing arguments were given, the trial judge was informed by the marshal that one of the jurors had requested to speak to the judge. Juror Adams was brought to the judge's chambers where, in the presence of the judge, his court personnel, and the court reporter, Juror Adams disclosed that she had been contacted on the previous night by a woman who made reference to the trial and to one of the defendants, Joe Reams.[3] After discussing the details with the judge, Adams stated that she had not mentioned the incident to the other jurors. The judge excused Adams and replaced her with an alternate pursuant to Fed.R.Crim.P. 24(c). Adams was instructed not to discuss the incident with anyone. To avoid her having any contact with the jury, the judge had Adams wait in his chambers until the jury returned to the courtroom, at which time Adams left the courthouse. When proceedings resumed, the judge informed the parties and their counsel, outside the presence of the jury, that he had excused and replaced "the Juror Lula Adams because of a matter that developed overnight that she brought to my attention." No inquiry was made by the government or by the defendants. When the jury was brought into the courtroom, the judge repeated that Juror Adams was excused because of "something [that] developed overnight."
 
 
 4
 After the jury returned its verdicts, the judge interviewed the jurors individually and without counsel present. The judge learned that Juror Adams had in fact mentioned the incident in the jury room minutes before she disclosed to the judge that she had been contacted. The judge learned that when Adams arrived at the courthouse that morning, she began discussing the incident with a few jurors, but was stopped by the jurors when she revealed that the woman who approached her mentioned the trial and defendant Joe Reams. The other jurors told Adams to see the judge immediately about the incident. Adams then left the jury room and requested to see the judge. Transcripts of these post-verdict interviews and the interview with Juror Adams were prepared and given to the parties.
 
 
 5
 After counsel had an opportunity to review these transcripts, the court again interviewed the jurors separately, but with the parties and their counsel present. Counsel were allowed to submit questions to the judge, who questioned the jurors. The interviews revealed that two of the twelve jurors did not know that a juror had been contacted. The other ten jurors were aware to various degrees that Adams had been contacted. Five jurors knew that she had been contacted, but were unaware that a name had been mentioned. The other five jurors knew that she had been contacted and that Reams' name was mentioned. The alternate also knew of a contact, but was unaware of any names mentioned.
 
 
 6
 The court found that the jury's deliberations were not biased by the improper contact. The jurors testified that after Adams left the jury room the incident was never again discussed. Each juror testified that the improper contact did not affect the deliberations and had no bearing whatsoever on the verdicts. The court noted that the jurors were candid and forthcoming in their responses to the questions. No juror hesitated or was reluctant in answering. The court concluded that the defendants were not prejudiced, and denied all motions for mistrial and new trial.
 
 
 7
 The appellants contend that they were deprived of their constitutional right to be present at all stages of the trial and their parallel right pursuant to Fed.R.Crim.P. 43 when the court interviewed Juror Adams and the other members of the jury outside their presence and the presence of counsel. The appellants also contend that the court erred in not examining each juror in the presence of counsel immediately upon discovering that Juror Adams had been contacted. Finally, they contend that the court erred in denying their motion for new trial because they were prejudiced by the improper contact.
 
 
 8
 We hold that the appellants' constitutional right to be present at every stage of the criminal proceedings was not violated by the court's interview of Juror Adams. " '[T]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.' " United States v. Gagnon, 470 U.S. 522, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (quoting Rushen v. Spain, 464 U.S. 114, 125-26, 104 S.Ct. 453, 459-60, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring in judgment)). See United States v. Watchmaker, 761 F.2d 1459, 1466 (11th Cir.1985) (where trial judge took great care in framing his comments, where transcripts were made available to counsel, and where post judgment motions provided opportunity to explore any possible prejudice, there was no due process violation), cert. denied, --- U.S. ---, ---, 106 S.Ct. 879-80, 88 L.Ed.2d 917, 917 (1986). We also hold that although the better practice would have been to notify the parties and their counsel immediately upon learning that Adams had been improperly contacted, the failure to do so and the failure to examine immediately the other jurors in the presence of the parties and their counsel does not constitute reversible error in this case because in any event the other members of the jury were not prejudiced by the improper contact. The post-verdict interviews in the presence of the parties and their counsel sufficiently demonstrate this absence of prejudice. The district judge should be afforded a considerable measure of discretion in handling these inadvertent situations.
 
 
 9
 This court recently reviewed the relevant case law in United States v. Caldwell, 776 F.2d 989, 997-98 (11th Cir.1985), and concluded that the cases fall along a continuum. At one end, the cases focus on the certainty that some impropriety exists. At the other end of the continuum, the cases focus on the seriousness of the accusation of impropriety. "The more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate." Id. at 998 (citing United States v. Brantley, 733 F.2d 1429 (11th Cir.1984), cert. denied, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); United States v. Phillips, 664 F.2d 971 (5th Cir.1981), cert. denied, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); United States v. Forrest, 620 F.2d 446 (5th Cir.1980)). We are concerned here with the latter end of the continuum and are guided by United States v. Forrest, which is cited in both United States v. Brantley and United States v. Phillips.
 
 
 10
 Forrest involved a similar contact to that involved in the case at bar. Prior to closing arguments a juror in the Forrest case told the trial judge that she was approached by her niece in an effort to influence her to acquit the defendants. The discussion between the juror and the judge, however, took place in the judge's chambers in the presence of counsel for both parties. The tainted juror assured the judge that the other jurors did not know of the contact. The court excused and replaced the juror, but did not examine the other jurors. The defendants were convicted. On appeal, the Fifth Circuit remanded for a hearing to determine whether the other members of the jury were prejudiced. The court of appeals held that the trial court's investigation into the improper contact was inadequate, and that a tainted juror's testimony that the other jurors knew nothing about the improper contact is an insufficient basis on which to conclude that the other jurors have not been contaminated. Forrest, 620 F.2d at 457-58. "Only the other jurors can enlighten [the court] properly on this subject." Id. at 457.
 
 
 11
 The appellants contend that the Forrest examination of the other jurors in this case should have taken place before rather than after the verdicts were rendered. Although Forrest can be read to suggest that the examination of the jurors should take place if possible before the verdicts are rendered, failure to do so in this case is not reversible error because the post-verdict interviews in the presence of the parties and their counsel demonstrate that the jurors were not prejudiced. Such post-verdict interviews are constitutionally sufficient to decide allegations of juror impartiality. See Smith v. Phillips, 455 U.S. 209, 217-18, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982); Remmer v. United States, 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954).[4] "The crucial issue is the degree and pervasiveness of the prejudicial influence." United States v. Williams, 568 F.2d 464, 470 (5th Cir.1978). We have reviewed the transcript of the post-verdict interviews and conclude that the district court's findings are not clearly erroneous. The jurors were not prejudiced by the improper contact. We hold, therefore, that the district court did not abuse its discretion in denying the motions for new trial on the basis of improper jury contact.
 
 II. PROSECUTORIAL MISCONDUCT
 
 12
 The appellants contend that the following remarks made by the prosecutrix during the rebuttal portion of her closing arguments denied them a fair trial:
 
 
 13
 MS. SCHWARTZ (Prosecutrix): And as Bart Carver told you, dope dealers deal with dope dealers, and you have to know, you don't find a swan in the sewer, and that's what you get when--. [objection] [sustained]
 
 
 14
 Record XXXIII at 86.
 
 
 15
 MS. SCHWARTZ: I believe that the Government has proven the Defendants guilty--. [objection]
 
 
 16
 ....
 
 
 17
 THE COURT: Continue. I got your point.
 
 
 18
 MRS. SCHWARTZ: I believe that the Government has proven, with the testimony and the evidence, that the Defendants are guilty beyond a reasonable doubt. [objection]
 
 
 19
 ....
 
 
 20
 THE COURT: Continue.
 
 
 21
 Record XXXIII at 98-99. The appellants argue that the comment about "dope dealers" and "sewers" was inflamatory because it depicts the defendants as drug dealers emanating from the sewer. Their argument is without merit. The appellants have taken the prosecutrix' statement out of context. The record clearly indicates that the prosecutrix was not referring to the defendants. Rather, she was referring to the government witnesses, whose credibility had been attacked by defense counsel on cross-examination and in closing arguments. The prosecutrix was merely reminding the jury that the government had conceded all along that its witnesses were drug dealers. Record XXXIII at 85. With respect to the remarks concerning the guilt of the defendants, the appellants contend that the prosecutrix' expression of her personal opinion denied them a fair trial. We disagree. "When the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment does not require a new trial." United States v. Granville, 716 F.2d 819, 822 (11th Cir.1983), aff'd on rehearing, 736 F.2d 1480 (11th Cir.1984). A prosecutor may say, " 'I believe the evidence has shown the defendant's guilt, [but not,] I believe that the defendant is guilty.' " United States v. Morris, 568 F.2d 396, 402 (5th Cir.1978) (citations omitted). The prosecutrix' statements in the case at bar are consistent with those allowed in Granville and Morris. We conclude, therefore, that the prosecutrix' comments were within permissible bounds.
 
 
 22
 Appellant Pintado-Otero contends that the district court erred in denying her motion for a mistrial as a result of the following statement by a government witness:
 
 
 23
 I was told over the radio or telephone, I forget, when I was called to set up surveillance, that we had a group of Latins that were probably in town to do a dope deal and that they were making phone calls to known dopers in Miami or somewhere south.
 
 
 24
 Record XXI at 130. This statement was made despite the district court's previous instruction to the government that its witnesses were not to testify that telephone calls were made to "known drug smugglers." Pintado-Otero argues that the witness' remark implies that Pintado-Otero, one of only two Latin defendants, was a narcotics dealer from Miami, making phone calls to her cohorts--"known dopers." Pintado-Otero argues that the government produced no evidence, however, that she was involved in any prior narcotics transactions. Pintado-Otero concludes that consequently the remark was prejudicial.
 
 
 25
 We hold that the district court properly denied the motion for mistrial. When the evidence is withdrawn from the jury with an instruction to disregard it, "the error is cured unless the evidence is so highly prejudicial as to render the error incurable." United States v. Benz, 740 F.2d 903, 916 (11th Cir.1984), cert. denied, --- U.S. ---, 106 S.Ct. 62, 88 L.Ed.2d 51 (1986). The testimony in this case was not so highly prejudicial as to render the error incurable. Indeed, any prejudice as a result of the remark was cured by the court's immediate curative instruction, Record XXI at 145, and minimized by the fact that the remark was not repeated or referred to thereafter. See United States v. Hernandez, 750 F.2d 1256, 1259 (5th Cir.1985) (in reversing conviction the court emphasized that no instruction was given to disregard the testimony and the prosecutor attempted to exploit the prejudicial testimony in closing arguments).
 
 III. IMPEACHMENT EVIDENCE
 
 26
 Appellants McMullen and the Hockadays were convicted of conspiracy to possess and possession of marijuana with the intent to distribute. Coconspirator and government witness M.L. Tucker implicated the defendants in these crimes. Through cross-examination defense counsel revealed that Tucker was serving time in prison for other crimes when he agreed to cooperate with federal officials in return for his early release from prison and immunity from prosecution for his involvement with the appellants in this case. Also on cross-examination, Tucker was asked whether his wife gave birth to their child while Tucker was in prison. Tucker responded that his child was born after he was released from prison. As part of the defendants' case, appellant Jerry Hockaday attempted to introduce a hospital medical record through the testimony of the hospital records custodian. The medical record indicated that a woman gave birth to a child on September 9, 1982, while Tucker was in prison, and stated that Tucker was the father. Defense counsel argued at trial that the medical record was relevant for two reasons: first, it demonstrated that Tucker lied on cross-examination about the date of his child's birth; and second, it revealed that Tucker had an additional motive to obtain an early release from prison--to be with his child. The court sustained the government's objection that this was impeachment evidence as to a collateral matter. The appellants contend that the court erred in refusing to admit the record into evidence.
 
 
 27
 We hold that the district court did not err in refusing to admit the medical record. The birth date of Tucker's child is clearly a collateral matter on which Tucker cannot be impeached by extrinsic evidence. See United States v. Russell, 717 F.2d 518, 520 (11th Cir.1983). Further, although the importance of exposing a witness' motivation to cooperate with the prosecution has been long recognized in this circuit, see generally Jenkins v. Wainwright, 763 F.2d 1390, 1392 (11th Cir.1985) (and cases cited therein), cert. denied, --- U.S. ---, 106 S.Ct. 2290, 90 L.Ed.2d 730 (1986), we believe the cross-examination of Tucker sufficiently demonstrated his motivation to cooperate with the prosecution so that the evidence sought to be admitted was merely cumulative.
 
 IV. SUFFICIENCY OF THE EVIDENCE
 
 28
 Appellants Elliott, Otero, and Morra challenge the sufficiency of the evidence against them. We review the evidence against the appellants in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 
 
 29
 Appellant Elliott was convicted of conspiracy to possess marijuana and possession of marijuana with the intent to distribute. The government's evidence against Elliott consists of the testimony of coconspirator and government witness, George Cottage. Cottage testified that he had known Lem North, one of the masterminds of the scheme to import marijuana, for several years. In September 1979, North invited Cottage to meet North in Valdosta, Georgia, for the purpose of "brokering" the marijuana from the first importation. Cottage invited appellants Elliott and Morrell along, explaining to them the purpose of the trip. Morrell drove. The trip was unsuccessful, however, and the three returned to Florida. In November 1979, after the second importation and upon Morrell's request, Cottage accompanied Morrell and Elliott to Valdosta, Georgia, to meet Lem North again. Before they checked into their hotel rooms, Elliott, Morrell, and Cottage met with North. North offered them a sample (three fourths of a pound) of marijuana for their prospective customers. Morrell took the sample and he and Elliott went to their adjoining hotel rooms. When Cottage arrived the prospective buyers were already in the rooms. Shortly thereafter, the police entered the rooms and found Morrell, Elliott, and Cottage together with the prospective buyers and the sample of marijuana. The strong odor of marijuana burning was present in the room. The sample matched the marijuana found at the stash site.
 
 
 30
 Elliott argues that this evidence only demonstrates his " 'mere presence' in a suspicious climate." We disagree.
 
 
 31
 For Elliott to be convicted of conspiracy to possess marijuana with the intent to distribute, "the government was required to prove beyond a reasonable doubt the existence of a conspiracy, his knowing participation in it, and his criminal intent." United States v. Cruz-Valdez, 773 F.2d 1541, 1544 (11th Cir.1985), cert. denied, --- U.S. ---, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). For Elliott to be convicted of the possession charge, "the government's burden was to prove beyond a reasonable doubt that he knowingly possessed the marijuana, either actually or constructively, and that he intended to distribute it." Id. We agree with Elliott that "mere presence" is insufficient to establish guilt on these charges. As this court recently recognized in Cruz-Valdez, however, the evidence in these cases "establishes not mere presence but presence under a particular set of circumstances." Id. at 1545. We hold that from the circumstances in this case the jury could find Elliott guilty beyond a reasonable doubt as charged. See United States v. Walker, 720 F.2d 1527, 1538 (11th Cir.1983) (the existence of a conspiracy may be proved by circumstantial evidence, including inferences from the conduct of the alleged participants), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). The evidence demonstrated that Elliott accompanied Morrell to Valdosta not once but on two separate occasions for the same purpose--to broker the imported marijuana. The logical inference to be drawn from this evidence is that Elliott and Morrell had agreed to broker the marijuana and were knowingly participating in that agreement. Elliott accompanied Morrell to North's hotel room where Morrell, Elliott's coconspirator, obtained a sample. Both Elliott and Morell then met their prospective buyers, who sampled the marijuana. We believe that the jury also could have reasonably inferred that Elliott together with Morrell possessed the marijuana with the intent to distribute.
 
 
 32
 Appellant Pintado-Otero was convicted of conspiracy to possess marijuana with the intent to distribute, possession of marijuana with the intent to distribute, and the unlawful carrying of a firearm during the commission of a felony. The evidence against Pintado-Otero consists of the testimony of a Florida Marine Patrol Officer, and of a coconspirator and government witness, Myra Labrador. Labrador testified that she was hired to accompany a man while he drove a motor home that was heavily loaded with marijuana. Man-and-woman combinations were needed to give the appearance of a "couple" vacationing in a motor home. Labrador testified that several other "couples" were hired to transport the marijuana in the same way. Labrador stated that she was placed in the back of a motor home with several others and taken to what was later identified as the stash site. Labrador identified appellant Pintado-Otero as one of the people in the motor home. When they arrived at the stash site, the "couples" were assigned different motor homes. The motor home in which Pintado-Otero was riding was followed from the stash site by the Florida Marine Patrol Officer who testified that Pintado-Otero's vehicle would not stop until it approached a roadblock. The officer directed the passengers, Pintado-Otero and her daughter, to step out of the vehicle. While he was directing the driver to step out, the officer noticed Pintado-Otero place her hand on her purse. The officer instructed Pintado-Otero not to move while he removed from Pintado-Otero's purse an automatic pistol, which was loaded and ready to fire.
 
 
 33
 Pintado-Otero argues that her mere presence in a vehicle transporting marijuana that was only accessible from the rear of the vehicle is insufficient to prove that she conspired to possess and possessed marijuana with the intent to distribute. Because these convictions must fall, her argument continues, so must the firearm conviction. We disagree.
 
 
 34
 The circumstances of Pintado-Otero's presence in the vehicle transporting a substantial quantity of marijuana demonstrate that she was part of a conspiracy to possess and possessed marijuana. Pintado-Otero was among those people taken to the stash site for the purpose of transporting large quantities of marijuana out of Florida in motor homes. Her presence was essential to the success of the ruse--to give the appearance of a couple vacationing in a motor home. She was arrested in a motor home heavily loaded down with marijuana. The strong odor of marijuana was present in the cab of the motor home. The logical inference to be drawn from this evidence is that a conspiracy to possess the marijuana with the intent to distribute existed and that Pintado-Otero knowingly participated in it. In these particular circumstances, Pintado-Otero had no more or no less control over the progression and destination of the motor home and its contents than did the driver. Consequently, they shared at least constructive possession of the marijuana. See United States v. Maspero, 496 F.2d 1354, 1359 (5th Cir.1974). We hold that the evidence is more than sufficient for the jury to have inferred beyond a reasonable doubt that Pintado-Otero engaged in a conspiracy to possess and possessed marijuana with the intent to distribute.
 
 
 35
 Appellant Morra was convicted of conspiracy to import marijuana, conspiracy to possess marijuana with the intent to distribute, two counts of importation, and two counts of possession. John Thomas, who piloted the Christine, which was involved in the first importation, testified for the government that he was hired by appellant Morra to import the marijuana from the Caribbean to Florida. Morra told Thomas and a man named Bart Carver that the load was 20,000 pounds. Carver secured a vessel, the Christine, and prepared it for the first importation. When it was ready, the Christine sailed for the Caribbean. The vessel developed mechanical problems, and Thomas contacted Morra and defendant Ronnie Fripp, who sent a mechanic. On Morra's instructions, Thomas sailed the Christine to the rendezvous with another ship where the Christine took on the 6,000 pounds of marijuana. When the Christine returned to Florida and arrived off the coast of Steinhatchee, Morra communicated with Thomas from a plane that circled above the vessel. Carver corroborated Thomas' testimony, adding that Morra and Fripp were partners and that Morra assured him that there would be additional loads. Patrick Harrell testified that he was hired to "sit on the stash site." Harrell met Morra, who Harrell stated was at the stash site when the marijuana was unloaded by the helicopters. Harrell testified that Morra, Fripp, and North were the masterminds of the scheme to import marijuana.
 
 
 36
 Morra concedes that the jury could have found him guilty beyond a reasonable doubt of conspiracy to import and importation of marijuana with respect to the first load. He argues that the evidence is insufficient, however, to support his conviction for possession of marijuana with the intent to distribute with respect to the first load. Morra's argument is without merit. The evidence places Morra at the stash site and shows that he, Fripp, and North were partners or the masterminds in the criminal venture, exercising control over the marijuana. The logical inference is that he along with Fripp and North possessed the marijuana with the intent to distribute. Morra also argues that the evidence is insufficient to connect him to the second importation. He contends that the government proved two conspiracies to import and two conspiracies to possess marijuana with the intent to distribute. Because he was not connected with the second importation, Morra argues that his conviction on the second importation charge, the second possession charge, and the charge of a continuing conspiracy to possess marijuana must be reversed. We disagree. The government's theory at trial was that there was one continuing conspiracy to import marijuana and one continuing conspiracy to possess marijuana with the intent to distribute. Morra and Fripp conspired to smuggle marijuana into the United States by ship and helicopter and to use Joe Reams' property as the stash site. The testimony of the witnesses demonstrated that Morra and Fripp were partners and that they and North financed the importations and distributions. We believe that this evidence is sufficient for the jury to have inferred beyond a reasonable doubt that Morra engaged in the continuing conspiracy to possess marijuana as well as the second importation and possession of marijuana.
 
 V. CONCLUSION
 
 37
 In conclusion, we hold that the appellants were not prejudiced by the improper jury contact, that the comments by the prosecutrix during closing argument were not improper, that the government witness' testimony was not prejudicial, that the trial court did not err in refusing to admit the collateral evidence, and that the evidence is sufficient to support the appellants' guilt beyond a reasonable doubt. Consequently we AFFIRM the appellants' convictions.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 Appellants Adams, Elliott, Morrell, Pintado-Otero, the Hockadays, and McMullen were convicted of conspiracy to possess and possession of marijuana with the intent to distribute. See 21 U.S.C. Secs. 841, 846; 18 U.S.C. Sec. 2. Pintado-Otero was also convicted of unlawfully carrying a firearm during the commission of a felony. See 18 U.S.C. Sec. 924(c). Appellant Morra was convicted of conspiracy to import marijuana and conspiracy to possess marijuana with the intent to distribute. He was also convicted on two counts of importation of marijuana, and on two counts of possession of marijuana with the intent to distribute. See 21 U.S.C. Secs. 952, 960, 963, 841, and 846; 18 U.S.C. Sec. 2
 
 
 [2]
 Honorable William Stafford, United States Chief District Judge for the Northern District of Florida
 
 
 [3]
 The relevant portion of the judge's discussion with Juror Adams follows:
 JUROR ADAMS: Well, this lady came to my house last night, I don't know what time it was. ... She told me that she was trying to get a job at Dixie Packers, that's where I work in Madison. Somebody told her ... where I lived at and I worked at Dixie Packers, and told her to come and talk to me about was they hiring at this present time at Dixie Packers. Well, I told her that I didn't know because I hadn't been to work in about two weeks and I didn't know was they hiring. I said I was going to Tallahassee every day on trial, on jury duty. ... And she come in and she said, oh, well--I asked her where was she from. She told me she was from Greenville and she had been working--she was a store manager at some store, and the man that owned the store was selling it, and that she was trying to find her another job, and she was asking me was they hiring. And she said that the man--after I told her about I was going to Tallahassee, you know, that I didn't know about was they hiring at the time or not, then she said "Well, maybe you know the man that owns the store because he's on trial up there." I said, "No, I don't think I do." And she said, "Well, his name is Joe Reeves (sic)." I said, "No, I haven't heard of that name." And she said, "Well they call him Joe Ball." And she said, "He owned the store that I worked at, that I was store manager, and he's selling the store." And he told her that they had him on trial for finding marijuana on his land and that he didn't know nothing about it cause he had so many acres of land that he didn't know that the marijuana was on his land, but they was trying to send him off for it. I said, "Well, I don't know him, no, because I'm not on that trial." And I got off the subject....
 ....
 And then when she was going out the door, she said, "Well, you listen when you go back up there," she said, "You listen for his name and maybe you'll know him and then maybe you could help him, then I won't have to find me another job because I could still keep my job, because he said he didn't do it, he didn't know nothing about it." And she left.
 THE COURT: Did you recognize the lady?
 JUROR ADAMS: No, I didn't know her at all. ...
 THE COURT: Did she--did you mention the jury service first?
 JUROR ADAMS: Yeah, I did.
 THE COURT: Uh-huh. And then that's when she--?
 JUROR ADAMS: That's when she said, "Well, maybe you know him, the man that owns the store, maybe you know him because he's on trial up there," and she said, "Joe Reeves." I said, no, no, I don't know him." She said, "Joe Ball, they call him Joe Ball." I said, "No, I don't think--" I said, "No, I'm not on that trial."
 ....
 THE COURT: Have you said anything to any other jurors?
 JUROR ADAMS: No....
 Record XXXII at 2-7.
 
 
 [4]
 Appellants argue that testimony of a juror is inherently suspect in these circumstances. The Supreme Court rejected a similar argument in Smith v. Phillips, supra, and noted that "surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7