865 F.2d 261
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ahmad A. KABIR; Hashim A. Batin, Defendants-Appellants.
 Nos. 87-3850, 87-3851.
 United States Court of Appeals, Sixth Circuit.
 Dec. 28, 1988.
 
 Before BOYCE F. MARTIN, Jr. and WELLFORD, Circuit Judges, and JAMES H. JARVIS*, District Judge.
 PER CURIAM.
 
 
 1
 Defendants Hashim Batin ("Batin") and Ahmad Kabir ("Kabir") appeal from their federal criminal convictions raising issues of juror bias or misconduct and misidentification. The district court denied the defendants' motions for mistrial and for a new trial based upon the jury bias or alleged misconduct; it admitted into evidence, despite objections, certain identification evidence. We affirm on both issues for the reasons indicated.
 
 
 2
 On April 9, 1985, two men robbed a Wells Fargo armored truck while it was being loaded with money at a Bank One branch in East Cleveland, Ohio. The truck was operated by Dan Dolezal, messenger, and Ken Des Gravise, driver. One of the robbers held a gun to Dolezal's head as Dolezal was loading money into the truck. The other robber held Des Gravise at gunpoint, warning him not to attempt to interfere or he would be shot. The first robber, with help from his companion, disarmed and threatened to kill Dolezal, who was approximately eight feet away from Des Gravise. Des Gravise observed the man holding a gun to his head for about one minute, and the other assailant for about thirty seconds.
 
 
 3
 The truck had a driver's station and a security compartment, separated by a wall with wire mesh at the top. There was also an opening of about 4" between the two areas of the truck for a gun port.
 
 
 4
 After subduing and threatening the two Wells Fargo employees, the two robbers grabbed bags of money and fled towards a waiting car in a nearby parking lot. Des Gravise, still armed, fired and hit the man who had assaulted Dolezal, but the wounded robber was then helped into the car by his cohort. In the subsequent flight from the scene, the car carrying the two robbers struck a telephone pole, but they both successfully escaped immediate capture.
 
 
 5
 Shortly after the robbery, both Dolezal and Des Gravise gave descriptions of the two robbers to law enforcement personnel. Des Gravise described his assailant as a short man in his forties, weighing approximately 160-70 pounds, with facial hair and a medium brown complexion, and wearing a hat. The other robber was described by Des Gravise as slightly taller, weighing less, in his forties or early fifties, with a high receding hairline and some facial hair. Dolezal briefly described the latter as about 5 feet, 9 or 10 inches in height, and black. About a week later, Des Gravise, assisted by an artist, put together a composite representation of both robbers. Dolezal was unable to describe the second robber who held a gun on Des Gravise, but also separately constructed a composite, with an artist's aid, of the robber who had threatened him.
 
 
 6
 In a subsequent photo array, both Des Gravise and Dolezal independently identified defendant Kabir as the first robber. Prior to viewing the display, Dolezal and Des Gravise were advised by FBI Agent James J. Larkin not to discuss the results of the photographic identification. Larkin also advised the two men not to feel that an identification had to be made and to avoid an identification by process of elimination. A second photo display was arranged, this time including a surveillance picture of defendant Batin. After examining this second group of photos, Des Gravise was, at this time, unable to identify the second robber.
 
 
 7
 Shortly thereafter, Kabir was arrested pursuant to a federal arrest warrant while accompanied by Batin, who was served with a subpoena to appear before a grand jury to provide fingerprints and photographs and to stand in a line-up. During a subsequent strip search of Kabir, healing wounds on his left thigh were observed, which the government contends were the remnants of a gunshot wound inflicted by Des Gravise.
 
 
 8
 The next day, a newspaper reported the developments and printed the Des Gravise composite of the second robber. Within a few days, however, Des Gravise contacted and advised the FBI agent who had constructed the earlier photo array that he had experienced a reoccurrence in his thoughts of one of the faces he had seen during the photo line-up. Des Gravise requested to see the pictures again, particularly those in the "walking mode" (which included the photograph of Batin). Following consultation with the local FBI legal adviser and the assistant United States Attorney prosecuting the case, the FBI agent met with Des Gravise and allowed him again to view the same photo display. This time Des Gravise indicated that Batin appeared to be the other robber.
 
 
 9
 Des Gravise and Dolezal attended line-ups in July of 1985. Dolezal, but not Des Gravise, was shown a line-up in which Kabir appeared and was able to identify Kabir as the man who had held him at gunpoint. Des Gravise viewed a line-up in which Batin appeared and identified him as the other robber. Batin and Kabir were the only two individuals to appear in both their respective line-ups and photo displays. Batin and Kabir were represented by counsel during the line-ups.
 
 
 10
 After an indictment was returned against defendants, the district court held a hearing and then denied the defendants' motion to suppress identification because of alleged faulty and unconstitutional pretrial procedures. At trial, Judge Krenzler denied a renewed motion to suppress identification, but the jury was unable to reach a verdict. The case was assigned to District Judge Ann Aldrich for a second trial. Again, the district court denied motions to suppress identification filed by both defendants.
 
 
 11
 At the close of the government's proof, the defendants renewed their motions to suppress and also moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). Judge Aldrich denied Kabir's Rule 29 motion, but deferred ruling on Batin's motion then and after submission of all the evidence. By Memorandum and Order after trial and return of a guilty verdict as to both defendants, the district court formally denied Batin's motions in a carefully reasoned analysis of the identification issues presented.
 
 
 12
 During the trial, just prior to final arguments and the giving of jury instructions by the district court, the trial judge advised counsel for the defendants that a juror had informed her law clerk that two women on the jury expressed concern because they believed the defendants were sketching them. Defendants' counsel presented the court with various papers demonstrating that the defendants had in fact been engaged in what the court then described for the record as "standard doodlings." The judge then asked counsel whether it would be proper for her clerk, who had received the information originally, to explain to the jury that "doodling" was all that was involved. The district judge then, without objection, requested her clerk to "explain that to the jury" and to "[g]ive them the standard instruction."
 
 
 13
 Later, Batin with whom Kabir joined, moved for a mistrial based upon the jurors' concerns or, in the alternative, for a voir dire of the jurors to determine their state of mind. The law clerk, called into the courtroom to explain what had transpired, related that she had been told by a gentleman on the jury that some of the women jurors found the perceived sketching to be "somewhat intimidating." The district court deferred action until after a verdict was returned. She instructed the jurors, however, to base their verdict "solely on the testimony and evidence in the case, without prejudice or sympathy," making no direct reference to the sketching incident.
 
 
 14
 After the guilty verdicts, the defendants moved for a new trial, arguing that members of the jury had been intimidated by their misapprehension that the defendants were sketching them. The district court conducted a post-trial voir dire of ten of the twelve deliberating jurors.[1]
 
 
 15
 Prior to conducting the voir dire, Judge Aldrich explained the procedure she intended to follow. She explained to the jurors the reason for their presence and admonished them not to discuss the matter among themselves. She then questioned each juror individually in her chambers in the presence of counsel, after advising counsel about the questions she intended to ask and affording an opportunity to suggest others. She would pose the questions to each juror. The defendants waived their opportunity to be present during the voir dire. Thereafter, each juror was questioned by the court in chambers with counsel being given the opportunity to suggest additional questions.
 
 
 16
 During the voir dire of juror Wilson, who originally complained about the sketching, Batin's counsel requested the court to ask Wilson whether she had, during trial, said to the juror seated next to her, "Look at the black son of a bitch. Is he making sketches to us?" The court refused to pose this question to the juror.[2] Juror Luksic, to whom the alleged racial slur was purportedly made by Wilson, was asked whether she heard "other jurors call the Defendant anything like a sonofabitch or anything" and she responded, "No, no." Following these proceedings, the district court held a hearing to afford defendants an opportunity to offer comments about the alleged racial slur.
 
 I. JURY BIAS OR MISCONDUCT
 
 17
 Kabir and Batin assert that the district court gave an "ineffectual admonition" prior to the return of the verdict and unduly delayed conducting a voir dire of the jurors after the verdict. The defendants also challenge the procedure used by the district court as deficient, arguing that they were not afforded an adequate opportunity to prove actual bias. Finally, the defendants argue that the evidence in fact demonstrated bias and prejudice and that the district court erred in relying upon the challenged jurors' assurances that their decision was reached without bias or prejudice.
 
 
 18
 Where jury partiality or misconduct is alleged, the remedy "is a hearing in which the defendant has the opportunity to prove actual bias." United States v. Pennell, 737 F.2d 521 (6th Cir.1984) (quoting Smith v. Phillips, 455 U.S. 209, 215 (1982)). In light of Phillips, this court in Pennell concluded that "the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed." 737 F.2d at 532.[3] Phillips indicates that "post-verdict interviews are constitutionally sufficient to decide allegations of juror impartiality." United States v. Adams, 799 F.2d 665, 669 (11th Cir.1986) (citing to Phillips, 455 U.S. at 217-18 and Remmer v. United States, 347 U.S. 227, 230 (1954)). See also United States v. Gagnon, 470 U.S. 522, 528 (1985).
 
 
 19
 We perceive no constitutional deficiency in the manner in which Judge Aldrich chose to proceed. The defendants' counsel voiced no objection prior to the time of that procedure. In their subsequent motion for a mistrial, Batin and Kabir requested a voir dire of the jurors to determine their state of mind. Judge Aldrich's decision to defer, in our view, complied with the requirements of Remmer and Phillips.
 
 
 20
 The defendants also complain that defense counsel were not allowed to question the jurors directly regarding the sketching incident, and Kabir also challenges the district court's failure to afford him or his counsel the opportunity to examine jurors Wilson and Luksic regarding the alleged racial slurs. All that is required, however, is "a hearing with all interested parties permitted to participate." Remmer, 347 U.S. at 230. We find no merit in the defendants' contentions.
 
 
 21
 The nature and extent of an investigation or hearing in this respect rests within the sound discretion of the trial court. United States v. Shackleford, 777 F.2d 1141, 1145 (6th Cir.1985); United States v. Brumbaugh, 471 F.2d 1128, 1130 (6th Cir.1973). See also Government of Virgin Islands v. Dowling, 814 F.2d 134 (3d Cir.1987). In United States v. Caldwell, 776 F.2d 989 (11th Cir.1985), the Eleventh Circuit approved the district court's questioning of the jurors with counsel being given the opportunity to provide input, noting that "had counsel taken an active role in the questioning, it would have put the juror and the defendant in an adversarial posture, which could have had an adverse affect on the juror." 776 F.2d at 997. We are not persuaded, therefore, by defendants' contentions in this respect.
 
 
 22
 Defense counsel, in the midst of the voir dire, requested that juror Wilson be questioned about the alleged slur based at that point upon unverified, anonymous information. The district judge stated the proposed question for the record, but refused to pose it to juror Wilson. Again, this handling of the alleged episode rested in the discretion of the trial court. We find no error in this regard. See United States v. Swainson, 548 F.2d 657, 664 (6th Cir.1987) (no abuse of discretion in refusal to conduct hearing into the question of possible juror misconduct based upon unverified allegations communicated by defense counsel); Caldwell, 776 F.2d at 998 ("[t]he more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate"); United States v. Bradshaw, 787 F.2d 1385, 1391 (10th Cir.1986) (trial court "justified in requiring defense counsel to produce more specific information" before conducting inquiry).
 
 
 23
 The delay in later investigation of this episode is explained by Judge Aldrich in her Memorandum and Order of August 17, 1987 as resulting from the defendants' delay in filing briefs in support of their motions for new trial combined with an accident suffered by Judge Aldrich. We find no due process violation under these circumstances, but we do not approve the district court's use of her law clerk in regard to jury contact.
 
 
 24
 We do not disturb the district court's findings regarding the jurors because she carefully gave her reasons for these findings, as well as for not crediting the two spectators, offered by defendants, who allegedly overheard the racial slur. Denial of a new trial was not erroneous, and we affirm this decision.
 
 II. IDENTIFICATION
 
 25
 Defendants Batin and Kabir both argue that the admission of the identification evidence against them violated their due process right to a fair trial. They contend that the pre-trial identification procedures utilized were impermissibly suggestive, causing a substantial likelihood of irreparable misidentification, and that the in-court identifications were inherently unreliable.
 
 
 26
 The district court concluded that, under the totality of the circumstances, the identification evidence against Batin was neither impermissibly suggestive nor unreliable. She first weighed the effect of the arguably suggestive procedure against the factors for reliability set forth in Neil v. Biggers, 409 U.S. 188, 199-200 (1972), as adopted by reference in Manson v. Brathwaite, 432 U.S. 98 (1977), to conclude that the identification evidence against Batin was reliable. See United States v. Tyler, 714 F.2d 664, 667 (6th Cir.1983). Manson provides that "[t]hese [factors] include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114. The district court concluded that Des Gravise's identification of Batin was not so unreliable that it must be suppressed and that the pretrial identification procedure was not suggestive. The district court gave no statement on the record for its reasons for denying Kabir's motions to suppress and for judgment of acquittal.
 
 
 27
 Kabir bases his claim that his in-court identification should have been suppressed upon the following: (1) photo spreads were not reviewed until almost two months after the robbery occurred; (2) Kabir was the only person in the line-up whose photo was also in the photo spread; (3) Dolezal and Des Gravise saw him during the first trial, and; (4) the descriptions given by Dolezal and Des Gravise fail to match Kabir's actual description.[4]
 
 
 28
 We find Kabir's contentions to be without merit. An examination of his photo array reveals no distinctive characteristic of his photo which would cause the array itself to be suggestive. Dolezal and Des Gravise independently viewed the array and both selected Kabir's photo, after being carefully instructed by FBI Agent Larkin that they were under no obligation to choose any of the photos. Indeed, the photographic identification was reliable based upon application of the Biggers factors. A nine month delay between the crime and the confrontation has been found not decisive. United States v. Marchand, 564 F.2d 983, 995 (2d Cir.1977), cert. denied 434 U.S. 1015 (1978). See also United States v. Barron, 575 F.2d 752 (9th Cir.1978). Des Gravise, and particularly Dolezal, had sufficient opportunity to view Kabir at the time of the crime and had every reason to focus attention on him as he threatened to kill Dolezal. Both identified Kabir positively in the photo array, and Dolezal subsequently identified Kabir at the line-up and at trial. The totality of the circumstances shows insufficient likelihood of irreparable or prejudicial misidentification either before trial or at trial.
 
 
 29
 Batin's identification is a more difficult issue. First, Batin argues that FBI Agent Larkin manipulated Des Gravise by showing him the photo array a second time when Larkin knew that a line-up was scheduled. We have held, however, "[w]hile it is preferable for law enforcement officers to use a line-up rather than a photographic identification when the suspect is available, this is not a requirement." Marchand, 564 F.2d at 995 (emphasis added); see also United States v. Allison, 616 F.2d 779, 783 (5th Cir.1980).
 
 
 30
 Batin next argues that Des Gravise should not have been permitted to view the Batin photo array a second time because of the intervening newspaper article, suggesting that Des Gravise was motivated by the reward offer reported in the article, and also because Des Gravise was unable to identify his photo initially. We find no error in the district court's resolution of these problems. The composite that appeared in the newspaper was constructed by Des Gravise himself; thus, his recollection was refreshed by his own prior recollection of the robber's features. We have upheld as not impermissibly suggestive the display to witnesses of bank surveillance camera photographs just prior to a line-up. United States v. Bridgeforth, 538 F.2d 1251 (6th Cir.1986); Finally, the issue of initial misidentification, or a failure to identify, is for the jury to decide. Ownes v. Foltz, 797 F.2d 294 (6th Cir.1986); United States v. O'Neal, 496 F.2d 368 (6th Cir.1974). We conclude that identification procedures were not constitutionally deficient and that both defendants received an essentially fair trial.
 
 
 31
 The convictions of both Kabir and Batin are therefore AFFIRMED.
 
 
 
 *
 THE HONORABLE JAMES H. JARVIS, United States District Court for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 An additional juror and a juror who had observed most of the trial before being excused for personal reasons were earlier examined separately. The twelfth juror was never required to report for voir dire because the district court was informed that his failing health required dependence on life-support equipment
 
 
 [2]
 Batin's counsel advised that he based the question upon information received during a lunch recess
 
 
 [3]
 The Pennell court concluded that its interpretation of Phillips applied to direct appeals of federal criminal convictions (Phillips involved a petition for writ of habeas corpus from a state court conviction) and that its reasoning applied both to allegations of jury misconduct and to unauthorized third party contact
 
 
 [4]
 The particulars of Batin's and Kabir's appearances on the date of arrest were stipulated by the parties. Kabir was 5 feet, 10 inches in height, 184 pounds in weight, of medium build, and thirty-two years old. Batin was 5 feet, 8 inches in height, 204 pounds in weight, heavy build and thirty-four years old