

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-1996

# United States v. Anderskow

Precedential or Non-Precedential:

Docket 95-5093,95-5094

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Anderskow" (1996). *1996 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

_____

No. 95-5093
_____

UNITED STATES OF AMERICA

v.

RALPH A. ANDERSKOW,

                              Appellant


_____

No. 95-5094
_____


UNITED STATES OF AMERICA

v.

DONALD ANCHORS,

                              Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Nos. 93-cr-00300-02 &
93-cr-00300-03)
_____


Argued January 25, 1996

        Before:  COWEN and SAROKIN, Circuit Judges, and
POLLAK, District Judge


(Filed July 9, 1996)
_____


Richard F. X. Regan, Esq. (ARGUED)
Hayden, Perle and Silber
1500 Harbor Boulevard
Weehawken, New Jersey  07087

        COUNSEL FOR APPELLANT ANDERSKOW


Michael M. Mustokoff, Esq. (ARGUED)

Teresa N, Cavenagh, Esq.
Judith E. Baylinson, Esq.
Duane, Morris & Heckscher
One Liberty Place
Philadelphia, PA  19103

          COUNSEL FOR APPELLANT ANCHORS


Allan Tananbaum (ARGUED)
Faith Hochberg
United States Attorney
970 Broad Street
Newark, New Jersey  07102

          COUNSEL FOR APPELLEE

_____

OPINION OF THE COURT
_____

COWEN, Circuit Judge.

     Ralph Anderskow and Donald Anchors appeal from judgments
of conviction and sentence entered by the District Court for the
District of New Jersey.  The convictions arise out of their
participation, along with several other coconspirators, in the
Euro-American Money Fund Trust (the "Trust"), an entity that was
used to perpetrate a pernicious advance-fee scheme.  Over a three-
year period, the Trust bilked unsuspecting loan applicants and
investors out of over eighteen million dollars.  Both defendants
raise evidentiary and legal sufficiency challenges.  We will affirm
the judgments of conviction.
                              I.
     John Voigt was the mastermind of a scheme to obtain fees
from loan applicants and potential investors for nonexistent loans
and investments.  At the heart of this scheme was the Trust.  Voigt
fabricated a fictitious genealogy for the Trust, claiming that it
was a long-established European financial institution affiliated
with the Catholic Church and the Knights of Malta, and that it had
access to billions of dollars.  For two and one-half years brokers
for the Trust would recount this false genealogy to unsuspecting
loan applicants and investors, who would part with substantial fees
in return for "self-liquidating" loans (loans that repaid
themselves) and "Master Collateral Commitments" ("MCCs"), allegedly
a special form of commercial paper available only to banks.
     Voigt benefitted from the cooperation of several
coconspirators, including Anderskow, a partner at a Chicago law
firm who also was a certified public accountant.  He was hired as
the Trust's lawyer in the Chicago area, and his credentials helped
provide the Trust with an appearance of legitimacy, which
facilitated its attempts to lure loan applicants and potential
investors.  Anderskow's primary responsibility was providing

guarantees to borrowers on behalf of the Trust and maintaining a client escrow account into which advance fees were deposited. Anderskow would immediately distribute fees that had been deposited into his escrow account according to Voigt's instructions, which violated the terms of contracts entered into with the loan applicants and investors. For his role in the Trust Anderskow received $995,000 in compensation.

In January of 1991 appellant Anchors was hired for the position of "loan oversight officer." Somewhat akin to a customer relations manager, Anchors was primarily responsible for responding to questions and complaints from customers of the Trust. Over time, Anchors devoted much of his time to placating loan applicants who had paid advance fees and were calling with increasing frequency to inquire as to the status of their loans. Anchors eventually responded to several hundred calls each month, assuring disgruntled borrowers that their loans were about to be funded. Eventually, Anchors began to tell some applicants that other loans had been funded, which he knew was untrue. Anchors received $325,000 for his participation in the Trust.

In June of 1993, a federal grand jury issued a twenty-six-count indictment against Anderskow, Anchors, and their three coconspirators--Voigt, Mercedes Travis, and Solis Alevy. Alevy entered a plea of guilty and became a government witness. Subsequently, the grand jury issued a twenty-eight-count superseding indictment against the remaining four defendants, charging Anderskow and Anchors with conspiracy to commit wire fraud, wire fraud, and money laundering, and bringing criminal money laundering forfeiture allegations against them.

After a three-month trial, a jury convicted Anderskow on all charges except two counts of wire fraud. Anchors was convicted of conspiracy and seven counts of wire fraud, but was acquitted of seven other counts of wire fraud and two counts of money laundering. Anderskow and Anchors were sentenced, respectively, to terms of imprisonment of seventy-eight and thirty-two months. This appeal followed.

II.

The district court had original jurisdiction over these criminal actions pursuant to 18 U.S.C. 3231. We exercise appellate jurisdiction to review final judgments of conviction under 28 U.S.C. 1291.

III.

Both Anderskow and Anchors contest the district court's decision to allow coconspirator Alevy, who pled guilty prior to trial and testified for the government, to give lay opinion testimony under Rule 701 of the Federal Rules of Evidence. Alevy's testimony tended to show that Anderskow and Anchors had knowledge of the Trust's fraudulent scheme. Contending that Alevy's allegedly improper testimony provided the government with its only evidence concerning their knowledge that the Trust was a fraud, both defendants claim that this alleged error was so prejudicial as to warrant a new trial. We disagree.

A. Anderskow

1.

During its case in chief, the government called Alevy to

testify about the workings of the Trust and its various components. Specifically, Alevy was asked to explain why in late 1991 he had drafted letters containing false information for Anderskow to sign and send to a victim of the Trust who had paid a substantial advance fee for an MCC, and was becoming angry at not having received it. Anderskow assigns error to the following exchanges between the government and Alevy:

> Q. How is it that you, on the one hand, passed false information to Mr. Anderskow but did not intend to deceive him?
>
> A. Mr. Anderskow was a daily participant in the same fraud that I was. I can't get into his mind, I have no way of knowing what he knew inside his mind, but it was obvious to me and told to me by Mr. Voigt that [Anderskow] will do anything we ask him to.
>
> . . .
>
> Q. When you passed on that false information to Mr. Anderskow, did you do it to deceive him?
>
> A. No, sir.
>
> Q. Why then did you pass on information if it wasn't true?
>
> A. It was part of the job I was doing, and he was doing the part of the job that he was doing, and some information was necessary for his part.
>
> . . .
>
> Q. Did you ever directly or specifically discuss this fraud with Mr. Anderskow?
>
> A. No, sir.
>
> Q. Why not?
>
> A. There was no reason to. We were both doing the same thing for the same ends every day.

App. at 1786, 1799.

2.

Anderskow's complaint is twofold. First, he claims that Alevy lacked sufficient personal knowledge to form an opinion as to whether Anderskow knew the Trust was a fraud and, therefore, that Alevy's testimony failed to meet Rule 701(a)'s "rational basis" requirement as a matter of law. Second, Anderskow appears to argue that even if Alevy's opinion was rationally based on his

perceptions, to the extent it suggested that Anderskow had guilty knowledge it was tantamount to an opinion on the ultimate issue of Anderskow's guilt. Alevy's opinion testimony, according to Anderskow, failed to meet Rule 701(b)'s "helpfulness" requirement as a matter of law.

We normally review alleged evidentiary errors for abuse of discretion. Government of Virgin Islands v. Knight, 989 F.2d 619, 629 (3d Cir.), cert. denied, 114 S. Ct. 556 (1993); Eisenberg v. Gagnon, 766 F.2d 770, 780 (3d Cir.), cert. denied, 474 U.S. 946, 106 S. Ct. 346 (1985). Anderskow, however, failed to object contemporaneously to any of the testimony about which he now complains. As a result, we review his contention for "'plain error,' that is, 'egregious error or a manifest miscarriage of justice.'" United States v. Price, 76 F.3d 526, 530 (3d Cir. 1996) (quoting United States v. Thame, 846 F.2d 200, 204 (3d Cir.), cert. denied, 488 U.S. 928, 109 S. Ct. 314 (1988)). See Fed. R. Crim. P.52(b).

We find no plain error because none of the disputed testimony actually contains a "lay opinion" by Alevy as to Anderskow's knowledge. Although it is readily apparent that in questioning why Anderskow would know that the information in the letters was false the government was attempting to elicit an opinion from Alevy, he never explicitly opined on direct examination that Anderskow possessed guilty knowledge. Instead, Alevy provided several reasons to support the unstated conclusion that Anderskow had guilty knowledge. For instance, Alevy testified that he did not believe that Anderskow would be deceived since Anderskow and Alevy were part of the same organization working toward a common goal, and because Voigt had told him that Anderskow would do anything they asked. This simply furnished the basis for an inference, based on circumstantial evidence, that Anderskow had guilty knowledge which the government was free to suggest during its closing argument and which the jury was free to accept or reject. Accordingly, since Alevy's testimony did not implicate Rule 701, there clearly was no plain error in its admission.

B. Anchors

Anchors advances a similar claim with respect to Alevy's testimony. Because Anchors preserved this claim for appellate review by raising a contemporaneous objection, we review the admission of Alevy's opinion testimony under Rule 701 for abuse of discretion. Knight, 989 F.2d at 629; Eisenberg, 766 F.2d at 780.

1.

During its case in chief, the government questioned Alevy about certain documents he had sent to Anchors to be passed along to borrowers who had paid advance fees and were becoming angry at not having seen any results. Anchors assigns error to the following exchanges between the government and Alevy:

Q. Now, when you were providing this information concerning schedules and projects to Mr. Anchors, did you intend to deceive him by that information?

A. No, sir.

Q. How so?

A.  I was doing my job, he was doing his job.

Q.  Did you believe that Donald Anchors would be deceived by the information that you were sending him?

    . . .

A.  Personally, I did not believe that.

Q.  Why not?

A.  Donald Anchors had probably 20 or 30 borrowers, maybe more for all I know, who had been promised millions of dollars for a long time, some as long as a year.  He had never seen one dime funded or loaned, and he kept on with the business at hand.  I had no reason to believe that he wasn't fully aware of what was occurring, as long as he was getting paid.

Q.  Did you ever specifically discuss fraud, the fraud in which you believed you were involved with Donald Anchors?

A.  No, sir.

Q.  Why not?

A.  There was no reason to discuss this, we were doing it.

App. at 503-04.

2.

Anchors first complains that he had insufficient contact with Alevy for his opinion to be "rationally based" on his perceptions.  We disagree.  We have held that lay opinion testimony can be based upon a witness' "knowledge and participation in the day-to-day affairs of his business," Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993), and upon a witness' review of written documents.  United States v. Leo, 941 F.2d 181, 193 (3d Cir. 1991); Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403-04 (3d Cir. 1980).  Alevy's testimony revealed that he had contact with Anchors by telephone and via facsimile on a weekly basis in the fall of 1991.  Most of this correspondence concerned loan schedules that had been promised to borrowers.  In explaining the workings of the Trust and the roles of its various members, Alevy testified that he would provide schedules containing false information to Anchors so that he could pass them along to the borrowers.  We think that in light of the weekly correspondence by telephone and facsimile between Alevy and Anchors, Alevy had sufficient first-hand knowledge such that his opinion was

"rationally based" on his perceptions.  Lightning Lube, Inc., 4 F.3d at 1175; Leo, 941 F.2d at 193; Teen-Ed, Inc., 620 F.2d at 403-04.

Although we conclude that Alevy's testimony was "rationally based" on his perception of Anchors, we conclude that Alevy's subjective belief that Anchors "must have known" fails to meet Rule 701(b)'s "helpfulness" requirement.  Anchors' principal contention is that the reasons supporting Alevy's opinion as to why Anchors would not be deceived were already before the jury.  Since it was for the jury to determine whether he "must have known" that the Trust was engaged in a large-scale fraud, Alevy's opinion on the subject, according to Anchors, essentially turned him into a thirteenth juror.  We agree.

In United States v. Rea, 958 F.2d 1206 (2d Cir. 1992), the Court of Appeals for the Second Circuit held that where the jury has before it the same circumstantial evidence of a defendant's criminal knowledge on which a witness bases an opinion concerning a defendant's knowledge, testimony from a witness concluding that the defendant "had to know" usually will not meet Rule 701(b)'s helpfulness requirement:

> [W]hen a witness has fully described what a defendant was in a position to observe, what the defendant was told, and what the defendant said or did, the witness's opinion as to the defendant's knowledge will often not be "helpful" within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant knew.

Id. at 1216 (internal citations omitted).  The Rea court found that testimony by a witness that the defendant "had to know" failed to meet Rule 701's helpfulness requirement, but went on to conclude that the error was harmless.

In this case, Alevy testified about the number of complaints Anchors was receiving from customers; Anchors' response to those complaints; and the sheer passage of time during which Anchors saw no loans funded.  That Alevy "had no reason to believe that [Anchors] wasn't fully aware of what was occurring, as long as he was getting paid," App. at 504, simply was not helpful to the jury's determination of Anchors' criminal knowledge.  The government suggests that because a coconspirator's subjective belief that a defendant "must have known" simply provides additional circumstantial evidence as to the defendant's objective mental state, it is helpful to the jury.  We are not persuaded.  We do not understand how a witness' subjective belief that a defendant "must have known" is helpful to a factfinder that has before it the very circumstantial evidence upon which the subjective opinion is based.  Furthermore, during its closing argument the government is free to ask the jury to draw the inference suggested by the circumstantial evidence: that the defendant must have known.  Accordingly, our holding does nothing to hamper the government's ability to establish a defendant's criminal knowledge, even where members of a conspiracy never openly discuss their criminal

activity.

Although we conclude that Alevy's opinion testimony fails to meet Rule 701(b)'s helpfulness requirement, its admission was harmless error. As our opinion will demonstrate, see infra IV.B., the circumstantial evidence of Anchors' knowledge was overwhelming. Furthermore, the government did not rely on Alevy's testimony in its summation, stressing instead the mountain of circumstantial evidence supporting the inference that Anchors "must have known." Accordingly, there is no possibility that Alevy's opinion testimony to the same effect contributed to the verdict.

## IV.

At trial the government had no direct proof of a tacit agreement among Voigt, Alevy, Anderskow and Anchors to engage in an advance-fee scheme. Accordingly, both defendants filed posttrial motions for judgments of acquittal contending that the government had failed to adduce sufficient evidence that they were knowing participants in a scheme to defraud potential borrowers and/or investors. They appeal the district court's denial of those motions.

Our review of the sufficiency of the evidence is "governed by strict principles of deference to a jury's findings," United States v. Ashfield, 735 F.2d 101, 106 (3d Cir.), cert. denied, 469 U.S. 858, 105 S. Ct. 189 (1984), such that we draw all reasonable inferences in favor of the jury verdict. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct 2781, 2789 (1979). We will overturn a verdict only "if no reasonable juror could accept evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987) (quoting United States v. Campbell, 702 F.2d 262, 264 (D.C. Cir. 1983)). Consequently, a "claim of insufficiency places a very heavy burden on an appellant." United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990) (quoting United States v. Losada, 674 F.2d 167, 173 (2d Cir.), cert. denied, 457 U.S. 1125, 102 S. Ct. 2945 (1982)), cert. denied, 499 U.S. 982, 111 S. Ct. 1637 (1991).

### A.    Anderskow

Anderskow was convicted on ten counts of money laundering arising out of various transfers of funds from his attorney escrow account to Trust members, pursuant to Voigt's instructions, between July and October of 1991. He also was convicted on numerous counts of wire fraud relating to his actions during the same period. Anderskow claims that the evidence is legally insufficient to sustain those convictions because the government failed to prove that he knew the funds being transferred represented the proceeds of unlawful activity, 18 U.S.C.  1956(a)(1), or that the transfers were intended to promote "the carrying on of specified unlawful activity." Id.  1956(a)(1)(A)(i). He likewise contends that the evidence is insufficient to demonstrate that he was a knowing and willful participant in a scheme to defraud. Id.  1343. Simply stated, Anderskow argues that the government failed to prove that he was a member of the conspiracy. We disagree.

The crucial period with respect to Anderskow's legal sufficiency challenges is July of 1991, the start of his money laundering activity. Anderskow's position on appeal is that he

joined the Trust believing it to be a bona fide provider of funding services and that Voigt was a "legitimate, honest international financier." Anderskow's Br. at 32. He also points to Alevy's testimony that they never openly discussed the fraudulent nature of the Trust and the "steady stream of false and deceptive information" Alevy provided him to be passed on to the Trust's customers. Id. at 34. Anderskow argues that absent Alevy's improper opinion testimony as to his knowledge, the government produced insufficient evidence that he was a knowing and willful participant in an illegal venture between July and September of 1991.

In rejecting Anderskow's argument, we begin our analysis by observing that at trial Anderskow asserted a good-faith defense to the fraud charges. The government, therefore, sought and obtained from the district court a "willful blindness" instruction. The district court charged the jury that "[t]he element of knowledge may be satisfied by inferences drawn from proof that a defendant may have deliberately closed his or her eyes to what otherwise had been obvious to him or her." App. at 4287–88. We think that even if Anderskow were correct that the government failed to establish that he was aware of the Trust's fraudulent nature when he first joined in March of 1990, viewed in the light most favorable to the government, Jackson v. Virginia, 443 U.S. at 319, 99 S. Ct. at 2789, the evidence more than adequately supports the jury's finding that he knew of the Trust's illegal activities by July of 1990 and, instead of withdrawing, continued as a willing participant in return for substantial remuneration.

As the government points out, the Trust Anderskow joined in March of 1990 had a "strong aura of unreality." Government's Br. at 77. It purported to sell "self-liquidating" loans; i.e., loans that did not have to be repaid. It also claimed to be a long-established European financial institution affiliated with the Catholic Church and the Knights of Malta, and that it had access to billions of dollars. Furthermore, loan applicants were required to sign bizarre confidentiality agreements that purported to bar customers from disclosing information about the Trust in this life and the hereafter. Loan applicants also were required to fill out peculiar personal questionnaires that asked if they could hold their breath under water or were flat footed, and they were asked to provide hair samples and blood tests. Given Anderskow's status as a partner in a Chicago law firm and a certified public accountant, and in light of his initial questioning of Trust brokers as to whether the money was "clean," a rational jury was entitled to find that Anderskow was suspicious from the outset. Furthermore, a rational jury could have accepted the government's argument that Anderskow's credentials provided the Trust with an appearance of legitimacy.

More significant, however, is that during 1990 no less than seventeen advance fees, which totaled $1.5 million, were deposited into Anderskow's escrow account. Despite the fact that not one loan was funded during that time, Anderskow immediately would parcel out the money to the various coconspirators. By July of 1991, moreover, seventeen additional borrowers and investors had paid Anderskow advance fees totaling $6.5 million dollars, which

Anderskow disbursed to his confederates. Anderskow himself testified that during 1991 he received approximately twelve complaints per day from anxious loan applicants and investors inquiring about their money. Although he knew that not one loan or MCC had been funded, Anderskow continued to provide a plethora of false excuses intended to lull customers into believing that their money was forthcoming.

Even more damning was Anderskow's admission under cross-examination that by dividing up advance fees among the coconspirators, instead of retaining them in his escrow account, he knew in June of 1991 that he was violating his contractual and ethical duty to hold customers' funds until they had received their loans. The evidence showed that Anderskow also lied to one borrower in the latter part of 1991, claiming that the Trust had funded loans in the past when, in fact, Anderskow knew that no such funding had occurred. Finally, the evidence of Anderskow's financial motive and willingness to cooperate is not seriously debatable. In 1990 Anderskow earned $100,000 from the Trust, and in 1991 he received $437,000, which was more than ten times greater than his 1989 income. Anderskow mechanically complied with Voigt's directions as to how to disburse the advance fees in his escrow account among the various coconspirators.

The government presented an overwhelming circumstantial case that by July of 1991 Anderskow had willfully blinded himself to the Trust's fraudulent activities. We have held that there must be evidence establishing a "'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward that goal." United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988). See United States v. McGlory, 968 F.2d 309, 321 (3d Cir. 1992), cert. denied, 507 U.S. 962, 113 S. Ct. 1388 (1993). We have further held that "all of the elements of the government's case, including the existence of the agreement, may be proven entirely through circumstantial evidence." United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996) (citing United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir.), cert. denied, 475 U.S. 1024, 106 S. Ct. 1220 (1986)). Given Anderskow's lulling of disgruntled customers, his admitted knowledge that disbursing advance fees among the coconspirators violated both the Trust's contractual obligations and his ethical duties, and his financial motive, a rational jury could have concluded beyond a reasonable doubt that Anderskow was a knowing and willing participant in a scheme to defraud by July of 1991.

B. Anchors

Anchors likewise contends that there is insufficient evidence of his knowing and willful participation in a scheme to defraud loan applicants. The jury acquitted Anchors of counts three through six, but found him guilty of counts seven through ten and twelve through fourteen. Accordingly, the jury found that Anchors had the requisite knowledge as of October 31, 1991, the date on which he faxed a letter on behalf of Anderskow. Again, while the government's evidence of Anchors' knowledge was entirely circumstantial, we think it provides overwhelming proof that Anchors had willfully blinded himself to the fact that he was participating in a fraudulent scheme.

Anchors joined the Trust as a "loan officer" in January of 1991, with thirty years of experience in business, the last seven of which were as a loan officer. From the moment he joined the Trust, Anchors was aware that there were loan applicants who had paid advance fees but had not received their loans. According to his own testimony, Anchors fielded "between 70 and 80" calls in January of 1991 alone from concerned customers. App. at 1203. By February, merely one month into his employment, Anchors informed Voigt that he was using "every excuse in the world," id. at 1205, and he raised the possibility of liabilities flowing from the Trust's failure to fund the loans. All the while, Anchors continued to provide excuses to angry customers, knowing that not a single loan had been funded. Anchors testified that by May of 1991 he was fielding approximately 250 calls per week.

Despite the fact that not one loan was funded, Anchors continued to assuage disgruntled applicants with excuse after excuse, responding to twenty calls per day from mid-July on. Furthermore, notwithstanding his attempts to downplay his significance to the Trust, Anchors clearly understood the importance of his role. For instance, he wrote Voigt that "sometimes I amaze myself with [the customers'] resultant patience," and that "I feel as though I am the [T]rust to those borrowers under my care." Id. at 181. More significantly, by September and October of 1991, Anchors had affirmatively lied to one customer, falsely telling him that eight other loans had been funded, which provided strong circumstantial evidence of knowledge and intent. At the same time, however, Anchors wrote to Alevy about the rising tide of customer complaints and asked for additional "creative" excuses that he could put in writing. Finally, Anchors' financial motive was beyond dispute. Although he earned $25,000 in the year prior to joining the Trust, he received $200,000 during 1991, his first year with the Trust.

We think that when viewed in the light most favorable to the government, Jackson v. Virginia, 443 U.S. at 319, 99 S. Ct at 2789, the circumstantial evidence of Anchors' knowledge and willful participation was overwhelming. Pointing to Alevy's testimony that they never discussed the fraud in which they were engaged, Anchors' principal contention is that, absent Alevy's allegedly improper opinion testimony, the government failed to adduce any direct evidence of his knowledge of the conspiracy's illicit purpose. As we noted earlier, however, "all of the elements of the government's case," including knowledge of the conspiracy's illicit purpose, "may be proven entirely through circumstantial evidence." Schramm, 75 F.3d at 156 (citing Kapp, 781 F.2d at 1010). If Anchors' argument were taken at face value, the government could never prove the existence of a conspiracy where, as here, the coconspirators do not discuss the fraudulent nature of their actions. United States v. Klein, 515 F.2d 751, 754 (3d Cir. 1975) ("Circumstantial evidence is clearly proper . . . especially in a conspiracy case where direct evidence is likely to be scant.") (footnote omitted). We refuse to so hold. Ten months passed during which no loan was ever funded. Given the mounting complaints and Anchors' willingness to provide both creative and false excuses for the Trust's nonperformance, which was motivated by the opportunity for

substantial financial remuneration, the jury had ample evidence with which to conclude that, at a minimum, Anchors had willfully blinded himself to the fact that the Trust was a fraud and that his actions were aiding its fraudulent purpose. See United States v. Ruuska, 883 F.2d 262, 264 (3d Cir. 1989) (lulling defrauded victims with false excuses is circumstantial evidence of mens rea); United States v. Shoup, 608 F.2d 950, 958 (3d Cir. 1979) (anticipated remuneration circumstantial evidence of coconspirator's mens rea).

United States v. Klein, 515 F.2d at 751, cited by Anchors, is not to the contrary. In Klein we set aside a defendant's convictions for mail fraud and conspiracy to commit mail fraud, which arose out of a scheme by owners of a "debt-ridden" hotel to set their hotel afire and then collect the proceeds of several fire insurance policies. Id. at 752. Klein was hired to destroy the hotel for $60,000. After the hotel had been partially destroyed by fire, codefendant Luick was hired by another unindicted coconspirator to prepare and submit proofs of loss forms to the insurance companies. We overturned Luick's convictions because submission of the proofs of loss forms alone failed to prove that he knew of the conspiracy's unlawful purpose. Although Luick had paid Klein a referral fee, and had done so in the past, we found it significant, if not dispositive, that "[i]t was not shown that . . . Luick should have been put on notice of suspicious facts in this case because of his past dealings with Klein. In fact the nature of Klein's and Luick's past dealings was left wholly unexplained." Id. at 755 (footnote omitted).

Here, by contrast, the relationship among Voigt, Alevy, Anderskow and Anchors was fully explored at trial. It is true that Anchors joined a conspiracy that was already in progress. But unlike the defendant in Klein, Anchors engaged in numerous activities over a substantial period of time in furtherance of the conspiracy. While Klein stands for the unremarkable proposition that a latecomer to a conspiracy does not automatically acquire knowledge of the conspiracy's unlawful purpose simply by taking a one-time action ostensibly in furtherance of its purpose, surely Klein does not preclude a conviction where, as here, the defendant provides a steady stream of false excuses in the face of mounting complaints from disgruntled customers in return for substantial remuneration. Klein is inapposite.

V.

For the foregoing reasons the judgments of conviction and sentence will be affirmed in all respects.