OPINION
SMITH, Circuit Judge.
Louis Mister appeals his convictions for aiding and abetting violations of 18 U.S.C. *173 § 1951(a) (extortion under color of official right) and 18 U.S.C. § 666(a)(1)(B) (solicitation of a corrupt payment). We will affirm.
Mister was involved in the local politics of Pleasantville, New Jersey. He was president of a political organization called the Real Democratic Club (“RDC”), a 25-30 member group dedicated to electing public officials in and around Pleasantville. RDC members devised a plan to win a majority of the seats on the Pleasantville Board of Education (“PBOE”), and then use those positions to solicit bribes from local businesses in exchange for PBOE contracts. Mister was not on the PBOE, but was friendly with several RDC members who were, including Jayson Adams, president of the PBOE; James Pressly, vice president of the PBOE; James McCormick; Maurice Callaway; and Rafael Velez. In April 2006, John D’Angelo, a local insurance broker, informed the FBI that PBOE members had approached him and asked him to pay bribes. The FBI began an investigation, using D’Angelo and Bruce Begg, the CEO of a local roofing company, as informants.
Over the next several months, RDC members, including members on the PBOE, undertook a plan to award PBOE insurance and roofing contracts to D’Angelo and Begg in exchange for bribes. On June 5, 2006, Mister and Callaway met Begg in Begg’s vehicle, which was parked in the empty parking lot of a restaurant. The purpose of the meeting was for Begg to deliver $3,000 in cash to Callaway in exchange for roofing business. Begg and Mister sat in the front of the vehicle, while Callaway sat in the back. Callaway was a candidate in an upcoming election for the Pleasantville City Council. He told Begg that he brought Mister with him because Mister was “a good friend” and because “me being the candidate[,] I always bring somebody with me[.]” Begg told Callaway that he only had $1,500 with him, but promised to deliver the rest of the money later that day. Mister counted the money from Begg while Begg and Callaway conversed. Begg mentioned that he’d spoken to PBOE member James Pressly, and would be meeting with him. Callaway told Begg that he too had spoken to Pressly and that “everything [was] done and going-through the way it’s supposed to be going.”
Begg also mentioned that he had received a call from Arnold Rice, who was in charge of “maintenance” at the schools, and the “second man in control” behind a man named Speedy Marsh. Begg said that he had arranged for a meeting with Rice soon. Callaway told Begg that Rice was involved “in the building thing” and was “the right guy” for Begg to talk to about it. Then the following exchange occurred:
Begg: So Speedy’s like what? Head of buildings and grounds or something? Callaway: Yeah, you got it. Head of facilities.
Begg: Okay. Alright. That’s good. I’ll ah, ... I’ll get together with him. [At that point, Begg reached for the $1,500] Callaway: Yeah, you can give it, give it to him [nodding towards Mister].... And uhm, if there’s any problems, me and him will take care of it. Me and the guy you gonna meet with.
Begg: Okay.
Callaway: Try to get you on the right step, and then you know, you looking at the big stuff, here.
Begg: Right. Right.
Callaway: You know, the schools — the complete schools.
Begg: Right. Right.
Callaway: That’s the way we’ll go.
Begg: Okay.
*174 Later that day, Mister met Begg at a rest stop elsewhere in New Jersey and accepted the other $1,500 cash payment on behalf of Callaway.
On August 6, 2006, James McCormick was appointed to the PBOE. This gave the RDC a majority of the seats on the Board. On August 23, 2006, Adams, Mister, and D’Angelo met. Adams introduced Mister to D’Angelo as “the cat that’s makin’ this meeting happen.” Referring to Mister, D’Angelo asked Adams, “[C]an I talk in front of him?” Adams responded in the affirmative. Eventually, the conversation turned to Mister and Adams’s aspirations to capture the Pleasantville City Council in the same way they had captured the PBOE. The following exchange occurred between Adams and Mister:
Mister [to D’Angelo]: With this, you need to just kick butt over there in the political arena and grab some seats. Adams: Just need to maintain control of that school board that’s all.
Mister: Need to take hold of Pleasant-ville. Then you take control of Pleas-antville, uh, council and uh, then we go after the contracts.
D’Angelo then suggested that Adams and Mister meet with Begg to talk about politics and fund-raising. Adams and Mister agreed. Mister responded:
We’ll do that we um, because um, once we, once we get um, Pleasantville, we get two more seats in Pleasantville on that council ’cause we got Pete and we got Line. We get four, we lock that council up then we lock them contracts up too.... That’s the goal.
On September 12, 2006, the PBOE voted to award D’Angelo’s company the contract for insurance brokerage services for the school district.
FBI agents arrested Mister, Adams, Callaway, and eight others on September 6, 2007. When he was first interviewed, Mister denied meeting with Begg and Cal-laway in the parking lot on June 5, 2006. After he was told that videotape existed of the meeting, however, Mister changed his story. He admitted that he was at the meeting, but said that Callaway had misled him about the nature of the payment. According to Mister, Callaway had told him that the payment was a contribution to Callaway’s campaign for city council. Mister had agreed to accompany Callaway to the meeting because Callaway had told him that, as a candidate, he could not “touch the money.”
A four-count superseding indictment was returned against Mister on March 12, 2008. Count I charged that Mister conspired with Callaway to obstruct interstate commerce by extortion under color of official right, in violation of 18 U.S.C. § 1951(a). Count II charged that Mister aided and abetted Callaway’s attempts to obstruct interstate commerce by extortion under color of official right, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2. Count III charged Mister with aiding and abetting Callaway’s solicitation of a corrupt payment, in violation of 18 U.S.C. § 666(a)(1)(B) and 18 U.S.C. § 2. Count IV charged that Mister aided and abetted an attempted extortion under color of official right, by obtaining money on behalf of James McCormick, in exchange for McCormick’s agreement to steer the PBOE insurance brokerage contract to D’Angelo. See 18 U.S.C. § 1951(a); 18 U.S.C. § 2.
A jury convicted Mister on Counts II and III but acquitted him on the others. Mister moved for a new trial pursuant to Rule 33, or a judgment of acquittal under Rule 29. The District Court denied both motions, and sentenced Mister to one year and one day of imprisonment and three years of supervised release. Mister filed a *175 timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.
Mister raises three issues in this appeal. First, he argues that there was insufficient evidence to sustain his convictions on Counts II and III. Second, he claims that the government constructively amended his indictment at trial, in violation of the Fifth Amendment. Third, he argues that prosecutors violated his due process rights by improperly arguing “guilt by association” during closing arguments. We reject each of these claims.
I.
“Our review of the sufficiency of the evidence is governed by strict principles of deference to a jury’s findings.” United States v. Anderskow, 88 F.3d 245, 251 (3d Cir.1996) (internal quotations omitted). If the jury’s verdict was supported by substantial evidence, we must uphold it. Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The substantial evidence inquiry requires us to decide whether “any rational trier of fact” could have found Mister guilty beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). In deciding this question, we view the evidence in the light most favorable to the government, Burks, 437 U.S. at 17, 98 S.Ct. 2141, and draw all reasonable inferences in the government’s favor. Anderskow, 88 F.3d at 251.
Mister argues that there was insufficient evidence to conclude that he knowingly and willfully accepted money from Begg for the purpose of aiding and abetting extortion, or aiding and abetting Calla-way’s solicitation of a corrupt payment. He points to Callaway’s testimony that Callaway never told him that the money was for a bribe. In fact, according to Mister, Callaway affirmatively misled him by telling him that the money was to pay campaign workers for a primary election the following day. Mister points out that there was no mention of contracts or roofing during the conversation between Begg and Callaway, and claims in any event that he was distracted during their conversation because he was busy counting the money. He also points to trial evidence indicating that he functions at a low-to-average intelligence level as further proof that he did not and could not have understood that the payment he accepted was in exchange for Callaway’s promise to steer PBOE roofing contracts to Begg.
We conclude that there was sufficient evidence to support the jury’s verdict. Mister was present during the entire conversation between Begg and Callaway. During that conversation, Begg told Calla-way that he had spoken to James Pressly, a school board member. Callaway assured Begg that he too had spoken with Pressly and that “everything [was] done and going-through the way it’s supposed to be going.” Callaway also told Begg that Arnold Rice, a supervisor within the school’s maintenance department, was involved in “the building thing” and that Rice was “the right guy” for Begg to talk to about it. Presumably, these maintenance employees would have been relevant to the procurement of the school’s roofing business. After Begg handed Callaway the $1,500, Cal-laway told him he was on “the right step” and that Begg was “looking at the big stuff here ... the schools — the complete schools.” Also, and significantly, Mister initially denied meeting with Callaway and Begg in the parking lot, and only recanted when confronted with videotape evidence to the contrary. The jury could have treated this false exculpatory statement as evidence of Mister’s consciousness of guilt. See United States v. Kemp, 500 F.3d 257, 296 (3d Cir.2007) (“It is well-settled that *176 untrue exculpatory statements may be considered as circumstantial evidence of the defendant’s consciousness of guilt,”' quoting United States v. Rajewski, 526 F.2d 149,158 (7th Cir.1975)). Under these facts, we cannot say that no rational jury could have convicted Mister. A rational jury could have concluded that he knew that the payments were a bribe from Begg to Callaway in exchange for business from the PBOE.
II.
The Fifth Amendment provides in relevant part that “[n]o person shall be held to answer for a capital! ] or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]” U.S. Const, amend. V. Accordingly, a defendant may be tried and convicted only on those charges contained in the indictment returned by a grand jury. Stirone v. United States, 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). “An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged.” United States v. Daraio, 445 F.3d 253, 259-60 (3d Cir.2006). Mister argues that his indictment was constructively amended, in that the indictment charged Mister with aiding and abetting a scheme to exchange money for influence on the PBOE, while prosecutors attempted to prove at trial that Mister aided in the exchange of money for future favors from Callaway on the Pleasantville City Council. Because Mister did not raise this claim at trial, we review for plain error. United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
The • indictment was narrowly drawn, and specifically accused Mister of aiding a scheme to exchange money for favors from the PBOE.[1] In light of this specificity, we agree that it would have been improper for the government to encourage the jury to convict Mister for participating in a scheme to trade money for official action from Callaway as a member of the city council. We do not think, however, that the government did so. During closing, the government twice cited Mister’s statement to Adams that the RDC needed to “take a hold of Pleasantville. Then [we] take control of Pleasantville ... council and ... then we go after the contracts.” We conclude that the government’s references to this statement did not constructively amend the indictment, for reasons ably explained by the District Court:
Defendant’s first reference to “Pleasant-ville” ... appears to be a reference to the Pleasantville PBOE itself, the school board. The second reference, “Then you take control of Pleasantville ... council,” refers to the council of Pleasantville. The word “then” clearly indicates both to the Court and to a jury that Defendant was talking about corrupting two distinct entities: first corrupt the school board, then corrupt the council. Defendant also went on to talk about efforts to unseat the Mayor. Thus, this evidence shows that in Defendant’s mind, the effort to corrupt the PBOE was part of a larger scheme to corrupt the whole *177 town, which he described after saying that the parties needed to take hold of the Pleasantville PBOE. It was not error for the Government to refer to this evidence. Although not the subject of this post-trial motion practice, Count Four charged Defendant with attempting to “take hold of’ the PBOE by helping to find a new member of the school board, James McCormick, who would vote for corrupt contracts. Thus, this evidence of Defendant speaking about Pleasantville and PBOE comtption was admissible to show that Defendant was aware of and intentionally participated in the scheme to take hold of the Pleas-antville PBOE by appointing a new corrupt member.
(A. 26-27, emphasis added, some alterations in original.) We think it highly unlikely that Mister’s statement about the need to “take hold of Pleasantville,” which was properly admitted for the reasons identified by the District Court, caused the jury to convict Mister for any crimes other than those charged. The District Court clearly instructed the jury that the corruption at issue in Counts Two and Three was corruption of the PBOE.[2] In general, we presume that the jury follows its instructions, United States v. Syme, 276 F.3d 131, 155 (3d Cir.2002), and we see no reason to abandon that presumption here. See also Daraio, 445 F.3d at 260 (concluding that although the government presented extensive evidence of defendant’s uncharged wrongdoing, “the district court’s instructions ensured that the jury would convict [the defendant], if at all, for a crime based on conduct charged in the indictment”).
In sum, we find no “substantial likelihood” that the jury convicted Mister on a corruption-of-city-eouncil theory, as opposed to a corruption-of-PBOE theory. See Daraio, 445 F.3d at 260. Thus, we find no error, let alone error that was “plain.” Olano, 507 U.S. at 732, 113 S.Ct. 1770. We will deny Mister’s request for a new trial on this basis.
III.
Finally, Mister claims that he was denied due process because the government encouraged the jury to convict him based on his association with criminals. He argues that the government’s closing argument improperly relied upon his friendship with corrupt Pleasantville politicians such as Adams and Callaway, and overemphasized the fact that both of those men had admitted to accepting bribes. In the same vein, Mister also objects to the prosecutor’s statement that “swans don’t swim in cesspools” in reference to Mister and the corruption that occurred in Pleas-antville in 2006.
Because Mister did not raise his guilt-by-association claim in the District Court, we again review for plain error. Olano, 507 U.S. at 731-32, 113 S.Ct. 1770 (1993). “We may reverse only if we find error in *178 the prosecutor’s comments so serious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.” United States v. Walker, 155 F.3d 180, 188 (3d Cir.1998). After carefully reviewing the government’s arguments, we conclude that this high standard is not met here. We find no insinuations of guilt by association that would have undermined the fundamental fairness of Mister’s trial. Even if the prosecutor’s references to Mister’s association with Callaway, Adams, and McCormick created some risk of prejudice, the District Court unambiguously instructed the jury as follows:
[Y]ou must not consider the fact of a witnesses] guilty plea as any evidence of Louis Mister’s guilt. Their decisions to plead guilty were personal decisions about their own guilt. Such evidence is offered only to allow you to assess the credibility of the witness; to eliminate any concern that the Defendant has been singled out for prosecution; and to explain how the witness came to possess detailed firsthand knowledge of the events about which he testified. You may consider a witness’ [s] guilty plea only for these purposes.
(A. 941-42.) “These instructions sufficed to cure any possibility of prejudice.” Zafiro v. United States, 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). See also id. at 540-41, 113 S.Ct. 933 (noting the presumption that jurors follow their instructions). Nor do we find the statement “swans don’t swim in cesspools” to be so fundamentally unfair and prejudicial as to contribute to a miscarriage of justice. Cf. United States v. Adams, 799 F.2d 665, 670 (11th Cir.1986) (rejecting claim that defendant was denied a fair trial by the prosecutor’s statement that “you don’t find a swan in the sewer,” in reference to the credibility of government witnesses).
IV.
We will affirm the judgment of conviction.

. The government argues that the inconsistency between the indictment and the trial evidence alleged by Mister amounted to a variance, not a constructive amendment. Because it does not affect our disposition of the case, we need not decide who is right. We assume without deciding that the error Mister alleges, if proven, would constitute a constructive amendment.

. The District Court instructed the jury:
Count Two alleges that on or about June 5, 2006, defendant Louis Mister aided and abetted an attempt to obstruct interstate commerce by extortion by obtaining money on behalf of Maurice Callaway, that was paid by another, with that person’s consent, in exchange for Callaway's official action and influence as specific opportunities arose in Callaway's capacity as a member of the PBOE.
(A. 1227, emphasis added). The Court's charge for Count Three was even more emphatic: "To sum up, to find the defendant guilty of the crime charged in Count Three, you must find ... that the defendant knowingly and willfully aided Maurice Callaway in knowingly, willfully and corruptly ... accepting, or agreeing to accept a thing of value; [and] that Maurice Callaway intended to be influenced with regard to the affairs of the Pleasantville Board of Education [.]” (A. 1243, emphasis added).